47 So.2d 417

## WILLIAMS v. STATE.
### 7 Div. 56.

Supreme Court of Alabama.
June 30, 1950.

Ellis & Fowler, of Columbiana, for appellant.

A. A. Carmichael, Atty. Gen., and Robt. Straub, Asst. Atty Gen., for the State.

BROWN, Justice.

The appellant was indicted by a grand jury in the Circuit Court of Shelby County, Alabama, for murder in the first degree. The indictment charged "that before the finding of this indictment Howard Leon Williams, alias H. L. Williams, whose true name is to the grand jury unknown otherwise than as stated, unlawfully, and with malice aforethought, killed Ethridge Garrison Richards, alias Ethridge Richards, whose true name is to the grand jury unknown otherwise than as stated, by shooting him with a shot gun, against the peace and dignity of the State of Alabama." On his arraignment he pleaded "not guilty" and "not guilty by reason of insanity." On the trial he was convicted of murder in the second degree and sentenced to the penitentiary for a term of 45 years. From the judgment of conviction, he has appealed.

An examination of the voluminous transcript (embodying more than 300 pages) leads us to the conclusion that the evidence made a case for jury decision on all the issues in the case. The evidence is without dispute that on the 11th of April, 1949, between 3:00 and 4 o'clock in the afternoon the appellant shot and killed said Ethridge Richards and his brother J. I. Richards in the same rencounter.

The evidence goes to show that the appellant was a veteran of World War No. II, 28 years of age and served overseas in the artillery forces. On his return to the United States he received an honorable discharge from the army. His entire war record was read in evidence by the Custodian from the Veterans Bureau showing that he was suffering from *dementia praecox*, a disease of the mind; that his mental development had been retarded and that he had the mind of a person from 8 to 10 years of age; that he was unsocial, preferred to be alone, was nervous and often when in combat would "black out."

The defendant offered two medical witnesses, practicing physicians of Shelby County, who basing their testimony on defendant's war record, testified that defendant was suffering from mental disease and when under excitement could not distinguish between right and wrong, nor could he refrain from acting under pressure whether his acts were right or wrong and that in their opinion if attacked he would not be responsible for his acts.

There was evidence going to support the plea of self defense. J. I. Richards, one of the men killed, was over fifty years of age and a short stocky man, and Ethridge Richards was forty-seven years of age and tall and active.

The controversy between the deceased and the defendant arose out of the defendant's claim of the legal right to cut cedar posts on land belonging to the Richards family, as heirs of their father. The beneficiaries of the estate included Mrs. J. A. Richards, the mother, and her three sons J. I. (Ivy) Richards, Cecil B. Richards and Ethridge G. Richards. This land was situated in Shelby County near Cedar Hill Church and near the home of Ethridge Richards and his mother. The evidence shows without dispute that these owners sold the timber on this land to the W. E. Blecher Lumber Co., Inc., for the sum of $2,000 and the deed which was in evidence conveyed all of the timber eight inches and up at the stump dead or alive, standing, lying, being or growing on the described lands. This deed was executed on the 1st day of December, 1948, by the named owners. The evidence also shows without dispute that the defendant, Williams, bought cedar timber for posts from the lumber company for ten cents per post and had permission from the lumber company to go on the land and cut said timber. This permission was first verbally given but was later reduced to writing, under circumstances appearing in the evidence.

On the morning before the killing, the evidence shows that, the defendant, his brother and brother-in-law Underwood, went to this place to take cedar timber for posts and were accosted by Ethridge Richards who asked the defendant if he had permission to take the cedar timber or posts. Defendant told him that he did but it wasn't in writing. He then told defendant that he'd better get it in writing, and defendant told him he would. The defendant and his brother and Underwood backed the Ford truck which they had brought with them for hauling the posts and went immediately to Centerville, Alabama, to the Belcher Lumber Company and got written permission to cut this timber. This written permission was signed by the Belcher Lumber Co., Inc., and was in the words as follows:

"Centreville, Alabama, April 11, 1949.

"To Whom It May Concern:

"This is to certify that Mr. H. L. Williams has our permission to cut paperwood from 8" and up from the timber left by our crews on lands owned by Richardson heirs in Shelby County, also cedar 8" and up in diameter. This applies only on the lands from which the undersigned company purchased the timber.

"W. E. Belcher Lumber Company, Inc.

"L. L. Harris, Forester."

The evidence was without dispute that the timber which appellant and his crew were

seeking to take was timber on the same land covered by the lumber company's deed.

The evidence further shows that when the defendant and his brother and Underwood returned, they stopped the trucks near a logging road where ruts had been made by heavy trucks, causing mud holes on each side of the logging road. The Ford truck was stopped near this gate and said mud holes. The brother of defendant and Underwood went on into the woods further up on the hill and were engaged in cutting cedar timber for posts and defendant, who was not well, remained at the truck for a while but later went on up to a pile of cedar posts, on the side of the hill, that had been cut and split and ready for loading on the truck and picked up two of the posts and was carrying them to the Ford truck and just as he got to the mud holes, according to defendant's testimony, both of the Richards men ran from behind said truck and attacked him, shoved him in the mud hole and Ethridge holding him down while J. I. was approaching with his knife making threats to cut his head off. The two posts which defendant was carrying were dropped across the mud holes and remained there until the officers of the law came to the scene. The defendant testified that his shot gun had been left by him in the bushes on the road side near this mud hole, that in the struggle he got loose from Ethridge Richards, and while still laying on his back, pushed away from Ethridge up the bank to a point where he could reach the gun and immediately shot J. I. Richards and then instantly shot Ethridge as he turned his side to him facing up the hill. Each of the Richards men was hit by several buckshot, one entering J. I.'s neck and one entering the temple on the right side of Ethridge, resulting in their deaths. The defendant immediately sent his brother and brother-in-law with the truck to notify and bring the officers of the law and they soon returned with the Chief of Police of Monetvallo, who is also a deputy sheriff, and later the Sheriff and his deputies came to the place of the difficulty. The defendant remained in the woods near the place of the fatal rencounter, and surrendered to the officers of the law, and made a statement to them in respect to the fatal rencounter and the circumstances leading to fatal results. Defendant later made a statement which was reduced to writing to one of the highway investigators. These statements after laying the predicate showing that they were voluntary were offered in evidence by the solicitor.

There was some discrepancy in the testimony of the defendant and these statements as related by the officers and as written down by the highway investigator, the discrepancy being in respect to the statement as made to said witnesses that defendant said he shot Ethridge as he ran up the hill or was running away. The defendant testified that what he did and said was that he shot him just as he turned around and immediately after he got hold of his gun, shooting J. I. first and Ethridge immediately thereafter. The defendant also offered testimony that the shots were made in rapid succession. This testimony was given by defendant's brother and Underwood, who were up in the woods at the time of the shooting, each testifying that the two blasts of the gun were in rapid succession.

The charge of the court was very full covering all phases of the case, and all the written instructions requested for the defendant were given.

We have examined the rulings of the court in respect to the admission and rejection of evidence and most of them appear to be without error, but those that we now proceed to treat were erroneous and constitute error, for which the judgment of conviction must be reversed.

The defendant called Van Hubbard, an employe of Belcher Lumber Company, who witnessed the execution of the timber deed, his name appearing thereon as a subscribing witness, and he testified on his direct examination that he saw Mrs. J. A. Richards, J. I. Richards and E. G. Richards sign the deed and that Cecil B. Richards' name appeared on the deed at the time they signed. On cross examination by the solicitor he testified that he was present in the home of J. I. Richards when said deed was signed in Montevallo in the home and Mrs. Richards was there, "I mean the wife of J. I.

Richards. I don't know whether Mr. Lemley was there or not."

The solicitor then cross examined Hubbard as follows:

"Q. Wasn't it first when you went down there and they sent you back with it? A. No. sir.

"Q. Don't you know this conversation took place between you and Mr. J. I. Richards?

"Mr. Ellis objects.

"The Court: I am going to let him show what happened at the time the contract was signed .

"(Mr. Ellis objects stating grounds but the court overuled the objection to which Mr. Ellis excepted and the witness was asked)

"Q. Who else was in company with you at the time? A. Mr. Walter Buford.

"Q. You two went to the home of J. I. Richards; wasn't this or this in substance said between you and Mr. J. I. Richards at that time? Mr. Richards said I can't sign it, then you asked, what is the matter and Mr. J. I. Richards said, there are two flaws in it, there is my cedar and my fence; I won't sell the cedar and you will have to repair all torn down fence. Was that said? A. No, sir.

"(Mr. Ellis objected stating grounds and the court overruled the objection and Mr. Ellis excepted.)

"Q. Mr. J. I. made the remark to you just as I questioned. You say that didn't happen? A. No, sir.

"(Mr. Ellis objects, stating the grounds the court overruled the objection and Mr. Ellis excepted.)

"Q. Isn't it a fact that he didn't sign it at that time and you and Mr. Buford left with the contract and returned the next day? A. No, sir.

"Q. And didn't he say this to you in substance, the next day when you presented this contract: You still haven't left out my cedar, and you said this, or this in substance: No, we are in a hurry to get to cutting, and said, don't make us change it, go ahead and sign it and I will guarantee they won't cut your cedar. That took place; I am talking about the day it was signed?

"(Mr. Ellis objected stating grounds and the court overruled the objection and Mr. Ellis excepted.)

"Q. Didn't you say—you told him we are in a hurry to get to cutting and if you will go ahead and sign I will guarantee your cedar posts won't be cut?

"Mr. Ellis objects.

"A. No, sir.

"Mr. Ellis: Let me get my objection in.

"By the Court: The question is completed and Mr. Ellis objected and the objection is overruled.

"By Mr. Ellis: I want to put it on the same grounds interposed to the last question, and we except.

"Q. Did that, or that in substance take place right there in Mr. J. I. Richards' home at the time this contract was signed?

"Mr. Ellis objects stating grounds and the court overruled the objection.

A. "No. sir.

"Mr. Ellis: We except.

"Q. You mean to tell the court Mr. J. I. Richards didn't reserve those cedar posts? A. No, sir.

Objection by Mr. Ellis, court overruled and Mr. Ellis excepted.

Mr. Walter Buford was also offered as a witness to prove the execution of the contract and testified in substance the same things as were testified to by Van Hubbard. On cross examination the solicitor put to this witness the following question:

"Didn't this take place whenever you presented this contract, Mr. Richards, I mean, Mr. J. I. Richards said this, or this in substance; I can't sign this contract, and you asked, what is the matter, and Mr. J. I. Richards said there are two flaws in it, there is my cedar and my fence. In other words there was no agreement as to the fence and—

"Mr. Ellis: We object.

"Q. Did that, or that in substance take place?

"Mr. Ellis: Objects (stating grounds.)

"By the Court: The last part of that question you asked Mr. Luck I will sustain

the objection. You laid the predicate, but you added something to it.

"By Mr. Luck. I will ask the question again.

"Q. At the same time and place I asked you in the former question, I will ask you if Mr. J. I. Richards didn't say, I can't sign it and you asked what is the matter and Mr. Richards said there are two flaws in it, there is my cedar and my fence?

"Mr. Ellis objects stating grounds and the court overruled the objection to which Mr. Ellis excepted.

"Q. He said that, didn't he?

"Mr. Ellis: We object on the same grounds and the court overruled the objection to which Mr. Ellis excepted.

"Q. That is a fact?

"Objection and exception.

"(Question read by the reporter)

"A. No, sir. * * *

"Q. If he didn't say, you haven't excepted my cedar, and you said this, well Mr. Richards we will guarantee your cedar won't be cut; we have a crew of men up there anxious to get to cutting and go ahead and sign it like it is, and we will guarantee the cedar won't be cut, and Mr. Richards said, under that condition all right?

"(Mr. Ellis objects, and the court overruled the objection and Mr. Ellis excepts.)

"Q. Did that take place? A. The cedar wasn't mentioned.

"Q. Answer the question, yes, or no?

"(Mr. Ellis objects, the court overruled the objection and Mr. Ellis excepts.)

"Q. Did that take place? A. The cedar wasn't mentioned.

"Q. Answer the question, yes, or no?

"(Mr. Ellis objects, the court overruled the objection and Mr. Ellis excepts.)

"A. No, sir."

While the witnesses on said cross examination gave negative answers to the question the ruling of the court was affirmative, stating the court would allow the state to show what occurred at the time the contract or deed was executed. And in rebuttal the state was allowed to show by several witnesses, among others J. T. Lemley that such conversation did take place. Lemley was asked this question on direct examination:

"Q. I will ask you to state whether or not this conversation or this conversation in substance took place at that time: that they presented to Mr. Richards a timber contract and Mr. Richards said this or this in substance at that time: Gentlemen I can't sign it, and they asked what is the matter, and Mr. Richards said, there are two flaws in it, there is my cedar and my fence, and I won't sell the cedar and you will have to repair the torn down fences? A. Yes, sir. * * *."

This answer was on motion of defendants' counsel excluded.

The question was then repeated by the solicitor who stated:

"Q. Answer the question, did that or that in substance take place A. Yes, sir."

The Court sustained this objection and the question was again read to the witness by the reporter and the witness answered "That was Mr. J. I."

"Q. That is what I said, Mr. J. I.? A. Yes, sir."

Counsel moved to exclude the answer on the same ground as stated previously but the court denied the motion. The question was repeated.

"Q. Mr. Witness did that or that in substance take place there.

"Mr. Ellis interposed the same objection as to the preceding question.

"Mr. Luck: Let me get my question asked and I will give him an opportunity to object. When I ask the witness for his answer he comes in and interrupts me.

"By Mr. Ellis: I had already objected. I want to suggest to the Court Mr. Luck has been all along asking the question then saying, is that true and I have got to object to each one to save the point.

"By the Court: Finish your question.

"By Mr. Luck: I have already finished it.

"By the Court: Witness don't answer this until Mr. Ellis has made his objection. Listen to the question.

"(Question read by the Court Reporter.)

"By Mr. Ellis: We object on the same grounds interposed to the preceding question. What is the Court's ruling on that.

"By Mr. Luck: My question is for him to answer whether that or that in substance took place.

"By Mr. Ellis: That is what I am objecting to.

"By Mr. Luck. No use repeating it.

"By Mr. Ellis: Your [Honor] knows if I sit here and don't object to the question they will say I am speculating and gambling on it.

"By the Court: Overrule the objection.

"By Mr. Ellis: We except.

"(Question read by the Court Reporter) "A. Yes, sir."

"By Mr. Ellis: We move to exclude the answer on the same grounds interposed.

"By the Court: I deny your motion.

"By Mr. Ellis: We except."

On the direct examination of Mrs. J. I. Richards, the state's witness in rebuttal was asked the following question:

"Q. Were you present on or about the first of December when a conversation was had between Mr. Buford and Mr. Hubbard with your husband in reference to the sale of some timber up there on the place? A. I was.

"Q. I will ask you to state whether or not, or this conversation in substance took place between Mr. Hubbard and Mr. Buford, representatives of the Belcher Lumber Company in reference to the sale of the timber, when they presented this contract, Mr. Richards said, gentlemen you haven't excepted my cedar and I can't sign that, and Mr. Buford and Mr. Hubbard said, well go ahead and sign it, we have got our men up there ready to go to cutting and we will guarantee to you the cedar won't be cut, don't put us to the trouble of going back to Centreville to have it changed.

(Defendant's counsel objected to this on sundry grounds as follows:)

"Mr. Ellis: We object on the following grounds separately and severally: It is illegal, irrelevant and immaterial and it seeks to impeach a written instrument by parole evidence, and the further ground it doesn't follow the predicate laid.

"By Mr. Luck. I want to add something.

"Q. and that Mr. Richards said, on that basis, upon that guarantee from you then I will sign it.

"By the Court: That question is part of the original.

"By Mr. Luck: Yes, sir.

"By Mr. Ellis: We object on the grounds just stated.

"By the Court: Overrule the objection.

"By Mr. Ellis: We except.

"Q. Just answer the question, did that or that in substance take place. A. That took place.

"Q. In your home? A. In my home, in my living room."

The transaction between the agents of the Belcher Lumber Company and J. I. Richards at his home when the contract was presented to him for his signature seeking to impeach the recitals in the deed was *res inter alias acta*, incompetent and immaterial to the issues in this case and the court erred in allowing this testimony to be received and go to the jury. It injected into the case an issue foreign to the issues on trial, sufficient to distract the minds of the jury in their deliberations as to the guilt or innocence of the defendant.

The solicitor on cross examination of the defendant laid the following predicate for his impeachment.

"A. My brother backed the truck out.

"Q. You were in the truck with him? A. I was standing on the runningboard, watching.

"Q. The other boy was in the truck too? A. Yes, sir.

"Q. All three of you back out and left? A. Yes, sir.

"Q. Where was Ethridge when you did that? A. He started on home.

"Q. Did he say anything to you when he started on home? A. No, sir.

"Q. Did you say anything to him? A. No, sir.

"Q. That is all that was done and said, he just asked you if you had a permit and

you told him you didn't have one in writing and he told you you had better get one and you said O.K. and you got in the truck and left, that is what happened? A. Yes, sir.

"Q. Don't you know the first thing he said to you when he walked up was, 'whop, don't cut that timber?' A. No, sir.

"Q. Then didn't you say, what difference, does it make? A. No, sir.

"Q. Then, Mr. Ab said, it is on my place, didn't he? A. No, sir.

"Q. And didn't you say, I have a right to this timber, and then he asked you who gave you that right? A. I didn't say nothing about no right.

"Q. And you told him Mr. Belcher gave you the right? A. I didn't say nothing about no right.

"Q. Nothing like that said? A. No, sir.

"Q. Then didn't he tell you, not this timber? A. No, sir.

"Q. Then didn't you tell him it was going to cost him for stopping the trucks and hands? A. No, sir.

"Q. And you said you were going to get the law? A. No, sir.

"Q. And this man turned around, Mr. Ethridge, and started away? A. No, sir.

"Q. And he told you you were just a damn liar. A. He didn't say that, no, sir.

"Q. Then you told him if he come out there with some of this damn smartness, I will cut your damn head off? A. No, sir, that wasn't said.

"Q. Then didn't you get your knife out? A. No, sir.

"Q. Then when the truck was backing out, started off you looked out and said, if you heard any other word out of him between there and the house you would drag him out of that house and cut his damn head off? A. No, sir.

"Q. Drag him out of his house and cut his damn head off? A. No, sir.

"Q. You did leave? A. We did leave, we didn't go back towards the house.

"Q. You did leave? A. Yes, sir.

"Q. You went to your home? A. Yes, sir.

"Q. And went and got this permit? A. Yes, sir.

"Q. Then you and these two boys came up to this place about one thirty? A. That is right. * * *."

The evidence is without dispute that the defendant, his brother and brother in law went to the place to where the controversy arose about the timber in a Ford truck. Based on the cross examination of the defendant as a predicate the solicitor offered Morris Howard [colored] in rebuttal and examined him as follows:

"Q. Is this Morris Howard? A. Yes, sir.

"Q. Where do you live? A. Coalmont.

"Q. Where did you live on April 11th of this year, the date that Mr. Ethridge Richards was killed? A. Coalmont.

"Q. I will ask you to state whether or not you were over at Mr. Ethridge Richards' home that morning somewhere about nine o'clock? A. I was.

"Q. I will ask you to state whether or not while you were there a truck passed with some men in it? A. I was standing in front of the garden gate.

"By Mr. Ellis: We object and move to exclude that.

"By the Court: Yes

"Q. You were there? A. Yes, sir.

"Q. I will ask you to state whether or not if you and Mr. Ethridge Richards went down the road after this truck passed? A. Yes, sir, we did.

"Q. I will ask you to state whether or not if you saw some men and a truck down on that logging road just off the Helena-Dogwood Road at that time? A. Yes, sir, I did.

"Q. I will ask you to state whether or not a conversation was had between Ethridge Richards and the men down there at that time. A. Yes, sir.

"Q. I mean one of the men? A. Yes, sir.

"Q. I will ask you if you heard—I will ask you to state whether or not this con-

versation, or this conversation took place between Mr. Ethridge Richards and one of them down at the truck at that time— A. Yes, sir.

"By Mr. Ellis. We object.

"By the Court: Don't answer yet.

"Q. That when Mr. Ethridge walked down there he said, 'Whop, don't you all cut that timber?' A. He did.

"By Mr. Ellis: We object and move to exclude that answer. He answered before I could object.

"By the Court: All right.

"By Mr. Ellis: We object on the following separate and several grounds it is illegal, irrelevant and immaterial and it is not shown to be these three men.

"By Mr. Luck: I have proven they had this conversation.

"By Mr. Ellis: And we proved they didn't have this conversation with our men, it might have been somebody else. They haven't identified this man. He said it was a Chevrolet truck before and the proof is that it was a Ford truck, and it is not shown to be these men.

"By the Court: Overrule the objection.

"By Mr. Ellis: We except and object on the following separate and several grounds; it is illegal, irrelevant and immaterial, and it is not shown Mr. Williams, the defendant was one of the men there, and it is a different time from the time our men got there.

"Q. About what time was that? A. Nine o'clock.

"Q. About nine o'clock? A. Yes, sir.

"Q. You didn't have any watch? A. No, sir, but Mr. Ab. had the time in the house.

"Q. I will ask you if this man further stated what difference does it make— * * *

"Q. I will ask you whether this conversation, or this in substance took place: When Mr. Ab. walked down there he said, 'whop, don't you cut that timber,' and one of the men said, what difference does it make—A. Yes, sir.

"By Mr. Ellis; We object and move to exclude the answer.

"By the Court: That is excluded.

"Q. And Mr. Ab. said, it is on my place, and the man said, I have a right to this timber and Mr. Ab. you called Mr. Ethridge, Mr. Ab. A. Yes, sir.

"By Mr. Ellis: We object on the following separate and several grounds; it is illegal, irrelevant and immaterial and it is not shown this conversation was had with Howard Williams, and it is not shown Howard Williams was present, and it does not follow the predicate laid by the State in the original question; it includes things which were not inquired about and omits things that were inquired about.

"By the Court: Give you an exception.

"By Mr. Ellis: And it is a different time than the time these parties were in there.

"By the Court: Overruled the objection.

"By Mr. Ellis: We except.

"Q. Did the conversation take place?

"By Mr. Ellis: We object to that question on the same grounds interposed to the last question.

"By the Court: Overrule the objection.

"Q. Answer the question.

"By the Court: I will let him answer the question, overrule the objection.

"By Mr. Ellis: We except.

"A. Yes, sir.

"By Mr. Ellis: We move to exclude the answer, and we object to that question. We have got to make our objection to the question. Mr. Luck keeps Questioning Him.

"(Question read by the Court Reporter)

"A. Yes, sir, he did.

"By Mr. Ellis: We move to exclude the answer on the same grounds interposed to the question.

"By the Court: I deny your motion.

"By Mr. Ellis: We except.

The evidence is without dispute that the first time that the defendant and his crew undertook to cut cedar from said lands was on April 11, 1949. There was evidence in the case that others had taken cedar from said land and the witness Morris Howard could not identify the two men as either the defendant or any one of his crew.

102

It is well settled law that the testimony of the impeaching witness must correspond with the predicate as to time and place and must identify the person from whom the predicate is drawn.

We are, therefore, of opinion that the court erred in overruling defendant's objections and in denying his motion to exclude the testimony given by this witness.

For the errors noted the judgment of the circuit court is reversed and the cause is remanded.

The defendant will remain in custody until lawfully discharged.

Reversed and remanded.

All the Justices concur, except GARDNER, C. J., not sitting.