119 So.2d 602

Oliver MYERS

v.

STATE.

8 Div. 493.

Court of Appeals of Alabama.

Feb. 23, 1960.

Rehearing Denied April 5, 1960.

618

MacDonald Gallion, Atty. Gen., and Jos. D. Phelps, Asst. Atty. Gen., for the State.

Starnes & Starnes, Guntersville, for appellant.

PRICE, Judge.

Appellant was convicted of manslaughter in the second degree under an indictment charging murder in the second degree.

On January 8, 1957, Carlton Eaton received a shotgun wound on his left leg and thigh. Upon arrival at the Guntersville City Hospital he was found to be in extreme shock from loss of blood. He was treated in the Guntersville Hospital until January 11, at 2:50 P.M., when he was transferred to the Veterans Administration Hospital in Birmingham. He was in

critical condition when he reached the Veterans Administration Hospital. His leg was amputated that day and he died January 14th. The death certificate recites the condition directly leading to death as gas gangrene of the left leg due to gunshot wound occurring six days prior to death, with bilateral pneumonia as a condition contributing to death but not related to the disease causing death.

According to the evidence the deceased and defendant, Oliver Myers, were brothers-in-law. The Eaton family breakfasted at the Myers home on the morning of the shooting which occurred around 2:00 P.M., at the home of deceased.

Barbara Eaton, deceased's daughter, who was eleven years old when her father was killed, testified an argument between her mother and aunt and her uncle and father took place at the Myers home, but she couldn't remember whether there was an argument between deceased and defendant on that occasion. Barbara and her mother testified defendant came to the Eaton home with a shotgun later in the day. Deceased and defendant wrestled over the gun and Myers had Eaton down on the floor and was on top of him with the gun barrel across his mouth when Mrs. Eaton attempted to pull Myers off her husband. Defendant slapped and shoved her back across a chair, whereupon she struck him with an iron poker, causing his head to bleed. Defendant then went out into the yard or road and began shooting toward the house. Several shots hit the house, one hit a front window, passing through another window on the side of the house. Another hit a door facing. Photographs purporting to show where shots had struck the house were introduced in evidence.

After firing several times at the house defendant drove away, saying he would be back. Deceased's widow testified that after defendant drove away she also left the house and did not return home that day.

Barbara testified Myers later returned to the Eaton home, and asked Mrs. Myers, who was there then also, "where is that half-brother of yours," Barbara stated she ran to John Hodge's pasture and while still in the pasture she heard a shot and heard more shots after she reached the Hodge barn. The barn was as far from her house, "as over across the street." For the record, appellant's counsel estimated, "that's approximately 200 feet or more." Barbara further testified that while she was in the Hodge's barn she saw her father come out of their house and heard him tell, "Uncle Oliver he wanted to tell him something and he was mad." Oliver Myers fired a shot and her father fell in the yard. After seeing her father fall she went to the Hodge house and defendant came there and brought a gun back. He said, "I have killed a man," and asked John Hodge to go with him to get James Hard to take her father to a doctor, but Mr. Hodge didn't go. Two nights later she saw her father in Guntersville Hospital and subsequently saw his body. She testified on cross examination that this was the first time she had made a statement and that she did not testify at the preliminary hearing.

John D. Hodge testified Oliver Myers came to his home with a single barrel shotgun on the afternoon of January 8th. His head was bleeding from a bad cut. He told witness, "That they had beat him up." Mrs. Hodge dressed his head and when he left he took Mr. Hodge's double barreled gun from its rack, and drove away in the direction of the Eaton home. Some twenty minutes later he returned the gun and told witness he had shot that boy and was in trouble. The voluntary character of the defendant's statements was sufficiently shown.

James Hard testified Oliver Myers came to his home on the afternoon in question and stated Mr. Eaton had been shot and asked witness to take him to the hospital. Mr. Hard found deceased lying in his front yard. His leg was bleeding and he was unconscious.

The defendant did not testify. The evidence in his behalf was directed toward showing that deceased's wife was intoxicated on the afternoon of the shooting, and sought to prove that it was impossible for Barbara Eaton to have seen the front of the house where the shooting was alleged to have taken place, from the pasture or barn at the Hodge place. John D. Hodge stated on cross examination that only the roof and back porch of the Eaton house were visible from his barn. On redirect examination he said that from a certain position in his pasture the front of the Eaton house and road in front of it could be seen. Defendant also introduced proof of his good character.

Counsel insists in brief that the evidence was insufficient to prove the corpus delicti, because "(1) the state did not offer the testimony of any investigator or officer of the law; (2) the state did not offer nor produce any alleged murder weapon nor empty shotgun shells; and (3) the state further failed to show by the daughter, wife, coroner, doctor or any other party or parties that either or any of them ever saw the dead body of Carlton Eaton."

■ It is not required that the corpus delicti be proved by the testimony of an officer of the law, nor that it be established by the introduction of the alleged murder weapon. We regard the testimony as sufficient to authorize the jury to conclude that defendant shot the deceased and that the shot produced his death. It is not denied that deceased died in the hospital six days after the shooting, moreover, deceased's wife testified he died and Barbara stated she saw her father's body.

■ It is further insisted that proof of death was sought to be established by a purported death certificate not shown to be under seal, and, "If the certificate was not under seal, it was not admissible for any purpose."

Title 22, Section 42, Code 1940, as amended, provides:

"The state registrar, upon request, shall supply to any applicant entitled to same a certified copy, under the seal of his office, of any record registered by him under provisions of this chapter, * * *. Any such copy of any record in the custody of the state registrar, when properly certified by him, shall be prima facie evidence in all courts and places of the facts therein stated." See also Title 7, Section 386, Code 1940.

Copied into the transcript of the evidence, as state's Exhibit 7, is what purports to be a "Certificate of Death," signed by "R. V. Klemme, Assistant Registrar." The certificate contains a "Medical Certification," with the name "H. P. Singletary, M. D.," affixed thereto. The death certificate was certified by "Ralph W. Roberts, State Registrar," countersigned by "Olivia McNair, Designated Bureau Clerk."

Although the typewritten copy does not recite that the certificate was under seal, at the time of its introduction the state's attorney announced to the court: "There is a seal, too." No ground of objection questioned the genuineness of the document. The single objection to the admissibility of the certificate was: "The doctor who treated the man at the time of his death and who made the certificate is within the subpoena powers of this court. That's the highest and best evidence." The certificate was properly received in evidence. Section 386, Title 7, Code 1940; Section 42, Title 22, Code, supra.

■ It is further argued that the testimony does not support a conviction for manslaughter in the second degree, and that the judgment should be reversed and the cause rendered. The evidence, if believed beyond a reasonable doubt, would have justified a verdict of homicide in a higher degree. The appellant cannot complain that the jury fixed the degree below that justified by the evidence. Gibson v. State, 25 Ala.App. 197, 143 So. 207; Champion v. State, 35 Ala.App. 7, 44 So.2d

616, certiorari denied 253 Ala. 436, 44 So. 2d 622.

There was no error in the overruling of the motion to exclude the state's evidence, nor in the refusal of the general affirmative charge or the denial of the motion for a new trial.

State's witness Barbara Eaton testified on direct examination that an argument had occurred at the Myers home on the morning of January 8, 1957, between, "my mother and my aunt and my uncle and my daddy," but that she couldn't remember whether there was an argument between her father and Oliver Myers.

On cross examination of Mrs. Eaton, Barbara's mother, the following occurred:

"Q. I will ask you if you didn't have some trouble with Mrs. Hallie Myers on that day?

"Mr. Ford: We object. The time and place is not laid.

"Mr. Starnes: I said on that day.

"Mr. Ford: I said the time and place is not laid.

"The Court: Sustain the objection.

"Q. I will ask you if you had any trouble with Mrs. Hallie Myers anywhere on that day, January 8, 1957, when you say your husband got into a difficulty with Oliver Myers? That's my question.

"Mr. Ford: We object. The time and place is not laid.

"The Court: I sustain the objection.

"Mr. Starnes: We offer this to test her recollection on that day. Because special counsel for the state started with breakfast in the morning and in great detail, elaborated in great detail throughout the morning. Certainly we cannot be cut off to test her recol-

lection of what occurred any time that morning. Certainly we have a right on cross examination. It is proper to test her recollection.

"The Court: All right. Any further questions?

"Q. I will ask you if at any time that morning of January 8, that you testified you went down, from any time you went down for breakfast at the Myers home until you left for your home that afternoon you had any difficulty with Mrs. Hallie Myers?

"Mr. Ford: We object. That has no bearing on the issues in this case, on the murder case which we are investigating and trying at this time.

"The Court: Sustain the objection.

"Mr. Starnes: We except and call your Honor's attention to the fact you permitted the state to show all the conditions which did exist and now you do not allow us to rebut it, and they went into detail as to what happened down there as to any trouble.

"The Court: I sustain the objection."

It is argued that since the state had shown by the witness Barbara Eaton that an argument had occurred between Mrs. Eaton and Mrs. Myers, defendant had a right to offer evidence to show that no such argument occurred.

"Where evidence is admissible for the purpose of contradiction, questions addressed to the witness who is to contradict must conform to the evidence to be contradicted. It is improper for the court to overrule an objection to questions, for the purpose of contradicting the testimony of another witness, which do not relate to the time, place, and matters about which the prior witness has been asked."

98 C.J.S. Witnesses § 638, p. 657. See also Williams v. State, 254 Ala. 94, 47 So.2d 417.

■ The questions asked Mrs. Eaton do not conform to Barbara's testimony as to time and place. The state's objections were properly sustained.

■ The Solicitor asked Barbara Eaton if she heard defendant say anything at the Hodge home when he brought the shotgun back. The answer was, "Yes." This question was asked: "Did you or anyone in your presence offer him any reward? That is, offer to give him anything or any hope of reward, that is any hope of giving him anything, or did you threaten him in anyway to get him to make a statement? Did you threaten him?" Witness answered, "No, sir." "Did you offer him any reward or did anyone in your presence do any such thing? "No, sir." "All right, what did he say?" The defendant's objection, on the ground that a proper predicate had not been laid for the admission of an alleged confession, was overruled. The witness replied, "He said, 'I have killed a man.'"

It is insisted that it is not shown that others present did not make threats against defendant.

Mr. John Hodge later testified concerning the defendant's return of the shotgun. He was asked, "Did you or anyone in your presence offer him any reward, any hope of reward, or threaten him in any way to get him to make a statement at that time?" The answer was, "No, sir." "Q. What did he say to you?" The witness replied, "He said he had shot that boy."

The error, if any, in admitting the confessory statement was cured by the testimony of John Hodge. Duck v. State, 38 Ala.App. 652, 92 So.2d 55.

We find no reversible error in the record. The judgment of the trial court is affirmed.

Affirmed.