The defendant was indicted and convicted for murder in the first degree. Sentence was life imprisonment. The major issue on appeal is the admission of a formal written statement given by the defendant.
 I
After shooting Chester Eugene Reeves, the defendant called the police and waited for their arrival. At the scene, Birmingham Police Officer Donald W. Toole advised the defendant of his constitutional rights. Officer Toole testified that the defendant then gave him the following statement:
 "Well, Mr. Price [the defendant] told me that the victim came into his bedroom and woke him up and the victim asked him if he had anything to drink; and Mr. Price said, told the victim, `Fuck you'; and the victim said, `Listen, you damn son of a bitch'; and Mr. Price then said, `Don't call my 78 year old mother a bitch'. Mr. Price then said he went and got a .22 rifle and went back into the victim's bedroom and the victim then said, `You are a son of a bitch'; and then the suspect pointed the rifle at the victim's chest and pulled the trigger."
* * * * * *
 "He said that — He told us that he meant to kill the victim and that the victim told him when the suspect shot him, `You got me', and then tumbled off the bed."
Officer Toole stated that this was "not everything he said, but it's a summation of what happened." Before the jury, Officer Toole testified that he "just mainly asked him what happened, and he started rambling on about what happened."
Sergeant Albert Wallace arrived at the scene and also obtained a second oral statement from the defendant.
 "He told me, `I killed him. I'll tell you what happened.'"
* * * * * *
 "He went ahead and told me what happened — that they had an argument and that he shot him."
After obtaining this confession, Sergeant Wallace took the defendant to City Hall and obtained a written confession. It is the admission of this third statement which is challenged on appeal.
The defendant does not challenge the voluntariness and admissibility of the first two statements given by the defendant at the scene of the crime although their voluntariness is not admitted or conceded and despite the fact that their admissibility was challenged at trial. Without detailing the circumstances surrounding each of these first two confessions, we find that they were voluntary and properly admitted into evidence. Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
The written statement the defendant gave to Sergeant Wallace is as follows:
 "What is your name? Virgil Price. How . . Virgil Copeland Price was his answer. (Q) How old are you Virgil? (A) 59. (Q) Knowing that you had been informed that you are charged with the death of Chester Reese, I'm going to read your rights to you at this time. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to your lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements. Do you understand each of these rights? (A) Yes, sir. (Q) That I have explained to you? (A) I listened to every word you said. (Q) Okay. Having these rights in mind, do you wish to talk to me now? (A) Yes, sir. And I said O.K. and His answer Are they any way you can get ahold of Pete Norris? (Q) You can call him if you want to. It's up to you. (A) I don't know how to call him. (Q) Okay. All *Page 1244 
right. (A) I would like to call him tonight. (Q) Okay. You want to go ahead and make your statement first and then we'll look up — in the phone book? (A) I'll make my statement. (Q) Okay. (A) I've already made it. Question — All right. You've made to the officers. His answer was: I shot him on purpose. It's like I told y'all. Question — Okay. All right. Answer — I meant to kill him. Question — Now you're not doing what I asked you. I asked you to just answer my questions. (A) Well, I am. (Q) Okay. Do you know a man by the name of Chester Reeves? (A) That's the one I shot. (Q) Okay. Does he live at your place, 1127 28th Street North? (A) He did. He lived there about a week. (Q) Okay. He came up about a week ago? Answer — He tried to whip me every time he saw me. Question — Okay. Now did you and Chester have difficulties today or this afternoon? (A) Yes, sir. (Q) And how many times have you had problems with him today? (A) He came in there and, uh, do you want me to tell you the whole story? (Q) If you would, just in your own words, tell me the whole story. (A) All right. I'm going to tell you. He came in there and told me, `Virgil, you got anything to drink?' I knew he had a quart of whiskey of his own. I said, `Naw, I don't want anything to drink.' That's the truth. And, uh, I'll give you a drink. I said, Naw I don't want a drink. I don't want to drink with you `cause you and I don't get along. And I say, When I rented to you, that I rented to the wrong man, and I don't aim to drink with you or have no dealings with you. He said, `Can I go ahead and use your stove?' I said, `Yep. You just clean up your mess if you make a mess in there, you clean it up'; cause I'm not physically able to clean up after everybody. And this no don't get no maid service. Well, that made him mad. Well, he went on in there and went to bed — I thought he went to bed. I went on in there and got in my — I sleep in a little old single bed, which I like; I don't have to, I got a double bed I could sleep in. He came in there and said, `You God-damn son of a bitch.' I said, `Now listen here. You're saying fighting words to me.' My daddy'd turn over in his grave, and he lived to be 82. My mother lived to be 87. I said, `Now, don't you call me another son of a bitch.' Well, about the time, I'm telling you the whole truth, and you mark it down there and if it goes to court, I'll still say that. About the time he got to the kitchen door, going in his room, he said, `You're just a sorry son of a bitch.' Well, I knowed that he'd done said the wrong damn thing then. If I could use that kind of language. I tried to quit cussing. But I walked over there and picked up my damn rifle — I had it standing just behind the curtain. And when he went in there and started to lay down, I shot the hell out of him. And I'm telling you just like the Lord knows, I meant to kill him, too. I didn't do it unintentionally or it wasn't no accident. I meant to kill him. And I'm saying that. I'll tell the judge I meant to kill him. A fellow can't call my mother, as good as a mother I had, and lived to be 87 years old and wait on me like she did — He can't call her no son of a bitch. (Q) What did you shoot him with? (A) A .22 rifle. (Q) Is that the officer you showed the rifle laying on the bed? (A) Right. That's it. (Q) Okay. Where was Reeves when you shot him? (A) He started to bed, but he never did get to the bed. (Q) Was he sitting down or standing up when you shot him? (A) Well, hell, he was fixing to lay down, I guess. And I told Melvin — Policemen have always told me if somebody's coming a towards you, shoot them in the right titty. Well, I busted at him. I got a nephew that's a policeman and I got a good friend that's a policeman. (Q) Okay. (A) Well, I tried to get aim, but I can't see good. I got my glasses with me now, and I got the best aim that I could at his right titty, and when I busted him, down, down he went. I thought, well, I done a good job, maybe. (Q) Okay. How many times did you shoot him? (A) One time. (Q) And it was a .22 rifle — caliber rifle? (A) Right. (Q) Okay. At the time you shot him, *Page 1245 
was he coming towards you? (A) No, he wasn't coming toward me. I'll tell you that. (Q) Did he have any kind of weapon in his hand — knife, gun? (A) Uh, he had a, uh, switch blade knife. (Q) In his hand? (A) Naw. (Q) Where was it? (A) He had it in his pocket. (Q) Okay. So at the time you shot him — (A) I wouldn't let him get it out of his pocket. (Q) At the time you shot him, he didn't have anything in his hand? (A) Unk -uh. I ain't lying to you, I'm telling you the honest truth. (Q) Okay. (A) If I shave my head and put me in the electric chair, I'll tell the truth. (Q) All right. After you shot him, what did you do? (A) I went back in there and told Archie — He was upstairs. I went up there and told Archie — Went upstairs told Archie, I said `Archie, I believe I've killed me a man. If I didn't, I meant to kill him.' And he said, `Well, what are you going to do?' I said, `I don't know. He fell over the side of the bed and I believe he's dead — I don't know.' (Q) Who called the police — Who called the police tonight? (A) I went up to that nigger's house, told him to call the law. I went down there to the phone booth, first going to call the Fire Department — See, they good in North Birmingham. They will run down there to anybody. When they went up there to Sadie's house — Sadie got the law on the phone for me quick as you can — I ain't calling no law. Well, I run on back down there to the phone booth below the house and I believe that 511, I believe that to the best of my knowledge it was — I said, `I got a man up here I think's dead. I just now shot him. Get the law up here as quick as you can.' The lady that answered the phone, said `All right. They'll be right there.' (Q) Okay. (A) Well, about that time, here comes the Fire Department and the law and I said, `Well, if he ain't dead, I meant for him to be dead.' (Q) Virgil, let me ask you this: This statement you just made, is it a true statement, a voluntary — as to what happened at your house tonight? (A) Every word I've told you is the truth. (Q) Okay. (A) Every word. (Q) Since you've been in these police officers' custody, have they mistreated you? (A) No, sir. (Q) Have they abused you? (A) Never. (Q) Have they told you what to say? (A) No, sir. (Q) Have they offered you money or any rewards to get you to make this statement? (A) No, sir. I ain't never offered no policeman or officer in my life one dime. (Q) Okay. You say. (A) In my whole life. (Q) This is a true and voluntary statement? (A) And one of them's never offered me anything. (Q) Okay. You haven't answered my questions. Is this a true and voluntary statement? (A) Right."
The defendant argues that this statement was involuntary because it was taken after he had exercised his right to counsel.
Before taking the statement, Sergeant Wallace advised the defendant of the "Miranda" rights. Wallace testified that, at City Hall, the defendant said that he would like to call Pete Norris, a local attorney. Sergeant Wallace gave the defendant a telephone and "told him to go ahead": "I gave him the phone and told him he could call." Before the jury, Sergeant Wallace testified that he gave the defendant a telephone and a phone book: "He was sitting at a desk where the phone and phone book was. I slid it over to him." However, the defendant did not contact Norris. According to Sergeant Wallace:
 "A. Once we got to City Hall, he [the defendant] asked me would I call Mr. Norris.
"Q. Pete Norris?
 "A. Yeah, said he would like to call Pete Norris, and I told him to go ahead."
* * * * * *
 "A. He said he didn't know how to dial him. I said, `Well, do you want me to dial him?' He said, `No.' I asked him if he would like to go ahead and finish his statement and call him later, and he said he would do that."
Later that same morning, the defendant asked Sergeant Wallace to call Mr. Norris. Sergeant Wallace contacted Norris at his *Page 1246 
office. Wallace testified that he did not call Norris before taking the defendant's statement because he "would have woke him up at 1:00 in the morning."
Sergeant Wallace stated that he obtained the statement merely as a "matter of record" since the defendant had already given an oral statement which included "some details and specifics." Mr. Norris never did see the defendant or furnish him any legal assistance.
Before the jury, Sergeant Wallace testified that the defendant said he wanted to talk to a lawyer but that he went on and took the defendant's statement "at his suggestion". Wallace stated that he gave the defendant every opportunity to call: "I told him several times at the scene or anywhere else he could call whoever he wanted to." The defendant did not attempt to use the phone book. Sergeant Wallace stated that there was no pause between the time the defendant stated that he would like to call Pete Norris and his response, "You want to go ahead and make your statement first and then we'll look up — in the phone book?"
Sergeant Wallace stated that although the defendant had been drinking he "wasn't impaired at all by alcohol when this came up."
The defendant was placed in the city jail on July 20, 1979, and was examined by a physician's assistant, Phillip Watkins, who testified that the defendant seemed stable: "Other than shaking, or anything like that, there was nothing that I could see that was wrong with him."
A second physician's assistant, Ned Whitehead, was called as a defense witness. He stated that on July 20th the defendant was malnourished and his "symptoms were very similar to a person who was about to go into DT's, delirium tremens, but he had not actually gone into that stage." At this time, the defendant was rational and "not intoxicated at all." In Whitehead's opinion the defendant's condition was the result of the excessive use of alcohol over a long period of time.
The defendant testified that he had "several drinks that day": "I guess I took five or six pretty good mixed drinks." When he was talking to the police officers he was "high" but not drunk. In substance, the defendant stated:
 "I told him [Sergeant Wallace] I did know Pete Norris and if I could get to talk to him on the phone, I'd like to have some legal advice for me. I said, `I happen to know Mr. Pete because he married a lady that I went to school with, and I do know him and I'd like to get some legal advice from him', and that passed off at that and I didn't ask any more. I just let it go at that, so I didn't insist; I didn't know that much about court. They read my rights to me, I didn't know but what I had to answer everything that was asked."
* * * * * *
 "I felt like they was officers and I was just another hand and I was supposed to answer what they asked me and I was supposed to talk to them."
The defendant testified that Sergeant Wallace did not give him a telephone.
On cross examination, the defendant stated that before he shot Mr. Reeves it had been about an hour since he had had anything to drink. This was about midnight and he had had "some to drink after dark, besides that drink."
The trial judge overruled the motion to suppress the confession finding and being "satisfied that this last statement is merely cumulative of the other statements given on that particular evening by this defendant." In its ruling, the trial judge referred to the case of "Alice Price versus the State" as raising a similar but not identical point. The only "Alice Price" case we have been able to find is Price v. State,52 Ala. App. 21, 288 So.2d 803 (1974), which does not involve the issue before us.
In allowing the confession into evidence, the trial judge did not rule that it was voluntary or made in compliance with the standards of Miranda. He merely found that it was cumulative of the two confessions already given. The trial judge, *Page 1247 
in effect and in fact, applied the standard of an appellate court in determining whether or not an error is harmless. Regardless of whether or not a statement is cumulative of prior statements, it should not be admitted into evidence until it is proven to be voluntary and intelligently given. Miranda, supra.
Miranda mandates that questioning must stop if the defendant "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking."384 U.S. at 445, 86 S.Ct. at 1612.
 "The burden is on the State to establish waiver in every case in which it seeks to introduce a statement taken without the presence of counsel. That burden becomes far more difficult, if not impossible, to sustain when the record shows that a request for counsel was made which was not honored before questioning continued."
Maglio v. Jago, 580 F.2d 202, 205 (6th Cir. 1978).
From the record it is not clear that the defendant was in fact asserting his right to counsel. From the defendant's point of view, there would be no advantage to be gained from asserting his right to counsel so late in the game. For this same reason — because the defendant had already confessed — there was no urgency or need for Sergeant Wallace to obtain a written confession.
Reviewing the facts of this case we cannot say that the State met its heavy burden to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Hines v. State, 384 So.2d 1171, 1173 (Ala.Cr.App.), cert. denied, 384 So.2d 1184 (Ala. 1980). Compare State v.Keesecker, 198 Neb. 426, 253 N.W.2d 169 (1977). The trial judge did not make such a determination and we do not consider the evidence so clear and convincing as to warrant such a finding by this Court. Therefore, the admission of the confession was error.
Finding error, we must next determine whether or not that error prejudiced the defendant. We have previously set out the text of all three statements given by the defendant.
"Where there is one confession by a defendant properly admitted into evidence and there was strong corroborative evidence of the guilt of the defendant, the admission of another confession, even though it should have been excluded upon objection, is harmless error." Kelley v. State,366 So.2d 1145, 1150 (Ala.Cr.App. 1979) citing Milton v. Wainwright,407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972). The facts and circumstances of each individual case must be examined to determine whether or not the admission of the illegal evidence prejudiced the defendant. Klemmer v. State, 51 Ala. App. 383,286 So.2d 58, cert. denied, 291 Ala. 786, 286 So.2d 62, cert. denied, 416 U.S. 957, 94 S.Ct. 1972, 40 L.Ed.2d 308 (1974);Cork v. State, 50 Ala. App. 670, 282 So.2d 107 (1973); Myers v.State, 40 Ala. App. 617, 119 So.2d 602 (1960); Minirth v. State,40 Ala. App. 527, 117 So.2d 355, cert. denied, 270 Ala. 228,117 So.2d 360 (1960). In some cases it may be impossible to avoid the conclusion that a written confession was accorded greater weight by the jury than was the oral one even though the oral confession was identical in all material facts with the written one. People v. Garofolo, 46 N.Y.2d 592, 415 N.Y.S.2d 810,389 N.E.2d 123 (1979). In others, harmless error may exist even though the objectionable statement conflicts with the defendant's testimony at trial. People v. Webb, 83 Cal.App.3d 83,147 Cal.Rptr. 608 (Cal.App. 1978). In still other cases, the erroneous admission of a confession may constitute a sufficient basis for a reversal even if the evidence, absent the confession, establishes a prima facie case against the defendant. Chunn v. State, 339 So.2d 1100 (Ala.Cr.App. 1976).
After carefully reviewing this record we cannot declare that the error in the admission of the third statement was harmlessbeyond a reasonable doubt. Harrington v. California,395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). Here, "the written statement may well have erased *Page 1248 
whatever doubt the jury entertained concerning the credibility of the witnesses upon whom the People had to rely to prove the contents of the unwritten one[s]." Garofolo, 415 N.Y.S.2d at 815, 46 N.Y.2d at 603. More importantly, we do not think a jury could read the written statement without being absolutely convinced of the defendant's guilt of intentional and malicious murder. This statement tends to refute any defense the defendant might have had and may well have erased whatever doubts the jury entertained concerning the issues of self-defense, sudden passion and provocation. This written statement was more than cumulative of the two oral statements. It had the effect of intensifying and magnifying both the substance and effect of the oral statements leaving no doubt of the defendant's guilt. Under these circumstances its admission was error prejudicial to the defendant.
Although the defendant's guilt is clear, his criminality is established through his own statements. One of these statements, clearly the most damaging to the defendant, should not have been admitted because the State did not prove that it was voluntarily and intelligently given. For this reason the judgment of the Circuit Court is reversed.
REVERSED AND REMANDED.
All Judges concur.