BOWEN, Presiding Judge.
Greg Myrick was convicted on two indictments charging separate sales of marijuana. He was given concurrent sentences of three years’ imprisonment in each case. On appeal, he argues that the trial court erred in preventing him from impeaching the credibility of the State’s main witness. We agree.
At trial, Charles Ivey testified that he had been hired by the Hanceville Police Department “as an undercover officer to work the drug problem.” He stated that “[ujsually when [he] made a buy [he] would take notes about the incident and then [he] would keep the marijuana or whatever [he] bought within [his] possession until [he] could turn it over to Chief McAnnally.”
Ivey testified that on April 10, 1985, he purchased marijuana from Myrick on two occasions. The first purchase was around 1:49 that afternoon at Ivey’s apartment. He placed the marijuana in his sock and made his notes on this purchase “[a]round 2:30 or so.” The second purchase was around 8:03 that evening at Jeff’s Quick Stop. Ivey testified that he made his notes on this transaction “[p]robably around 9 or 10 that night” at his residence. Ivey delivered two bags of marijuana and his notes from both transactions to Hanceville Police Chief McAnnally around 3:00 on the afternoon of April 11th. Each note was wrapped around a bag of marijuana.
At trial, Ivey identified the marijuana “with the notes around it,” and stated, “unless the notes was around it I couldn’t tell you.” He also testified that he had “referred to those notes today in refreshing [his] recollection to testify.” The record indicates that Ivey used the notes while testifying and had the notes with him on the witness stand. Before allowing cross-examination, the trial court stated to defense counsel, “You can get up and come up and look at these notes, anything you wish, including the exhibits, as you know.”
On cross-examination, Ivey testified that he “recalled” going to Birmingham or Warrior that evening but later testified that, after the second transaction, he and Myrick “messed around” Hanceville for “a little bit” and then returned to his apartment. He testified that he did not remember leaving the house that night. Ivey also stated that “basically” the only thing he remembered about “those dates” is what he had written on his notes.
Myrick denied selling any marijuana to Ivey at any time. He testified that he and Ivey left Jeff's Quick Stop around 5:30 and went to Ivey’s apartment where they remained until they left for The Desperado Club in Birmingham around 7:30 that night. When they returned at 4:00 the next morning, Ivey went to bed. The trial judge refused to allow defense counsel to show what occurred on the trip to Birmingham:
“MS. PASCHAL [Defense Counsel]: I’m trying to show you what Mr. Ivey did from the time he met Greg Myrick at Jeff’s Quick Stop until he returned home.
*1217 “THE COURT: I sustain any objection after 7:17 [the time the second sale was initiated] except that he [Ivey] came back and went to bed after 4:00 and when he left. Anything else would be irrelevant. 4:00 in the morning, he said he went to bed. That’s all in the record. The Defendant said Mr. Ivey went to bed when they got back to his apartment.
“Anything else?
“MS. PASCHAL: Mr. Ivey testified that he didn’t recall anything that he did. I want to bring that out to the jury.
“THE COURT: You can argue that from now on, what his testimony was, what the Defendant’s testimony was, where it conflicts.
“MS.’ PASCHAL: Yes, sir.
“THE COURT: Something else? You can argue conflicting testimony, if there is a conflict, that is a question you folks can argue.
“MS. PASCHAL: I think what transpired from the time Mr. Ivey and Mr. Myrick left to go to Birmingham and came back is very relevant,
“THE COURT: That is before the jury, he left at 7:30 and went to this place, what do they call that place, the Desperado, and got back home at 4:00 a.m. The evidence is in by the Defendant, then Mr. Ivey went to bed. That’s all before the jury, what time they left Mr. Ivey’s, what time they went to Birmingham, what time they got back, what Mr. Ivey did. He went to bed. You asked him anything else on the trip down to Birmingham, what they did down there, unless it is related to this case, drugs or whatever—
“MS. PASCHAL: Mr. Ivey stated that he made his notes immediately upon his return home. I wanted to show his physical condition to make notes or anything else.
“THE COURT: You showed that he was back at 4:00 a.m. That means that there is some question when did Ivey make his notes, do they believe Ivey or do they believe the Defendant, is what you’re talking about?
“MS. PASCHAL: Yes, sir.
“THE COURT: Thank you.”
Later during the trial, the trial judge sustained the prosecutor’s objection and refused to allow defense counsel to introduce a membership book at The Desperado Club, which members signed as they entered. During his cross-examination, Ivey had been unable to identify either the notebook or his alleged signature in the book.
The State argues that whether or not Ivey went to The Desperado Club after the sales of marijuana had occurred was “irrelevant to the trial and a collateral matter.” Appellee’s brief, p. 7. We find that the times when Ivey made his notes of the drug transactions, as well as his physical and mental condition at the time those notes were made, were relevant and material to the issues at trial because Ivey relied on. the notes in testifying and in refreshing his recollection about the events in issue. Ivey’s conduct after the sale and at The Desperado Club might very well have indicated intoxication and the degree of that intoxication when Ivey made his notes. This directly reflected on the accuracy of those notes.
Testimony tending to cast doubt on the accuracy of the notes and Ivey’s testimony did not violate the rule against impeachment on an immaterial issue. C. Gamble, McElroy’s Alabama Evidence § 156.01(1) (3d ed. 1977). Ivey’s intoxication at the time he made his notes was a material fact for purposes of impeachment. “The fact may get its materiality if it: ... (2) shows his intoxication at the time of the event to which he has testified,_” McElroy at § 156.01(4).
“The credibility of a witness may be impeached by proof of his intoxication but only if such intoxication occurs either at the time the witness takes the stand to testify or at the time he observed the facts to which he is testifying.” McElroy, at § 141.01(2); Annot., 8 A.L.R.3d 749 (1966). See also Morris v. State, 39 So. 608 (Ala.1905); Rector v. State, 11 Ala,App. 333, 344, 66 So. 857 (1914) (“The defendant had a right to show that the witness Nolen on the occasion of the difficulty was under the *1218 influence of liquor, and the degree or extent of his intoxication.”). “The credibility of a witness may be attacked by showing mental incapacity, but only if the incapacity exists at the time the witness testifies, or existed at the time of his observation of the incident about which he testifies.” Ex parte Tucker, 474 So.2d 134, 136 (Ala.1985). “[I]t is always proper to show matters affecting the condition of the witness at the time of the matters testified to, as affecting his ability to observe or recollect.” Annot., 8 A.L.R.3d at 755.
The logical application of these principles to this case means that Ivey’s credibility could have been impeached by showing that he was intoxicated at the time he made the notes from which he testified at trial.
“The established rule is that the accused is entitled to cross-examine a witness upon any matter testified to by him on direct examination as testing his memory, credibility, knowledge and accuracy.” Green v. State, 258 Ala. 471, 476, 64 So.2d 84 (1953). “It is always competent on cross-examination to make such interrogation of a witness as would tend to ... impeach the accuracy of his testimony.” Housing Authority v. Decatur Land Co., 258 Ala. 607, 612, 64 So.2d 594 (1953). “Cross-examination of prosecution witnesses in matters pertinent to their credibility ought to be given the widest possible scope.” Ex parte Jenkins, 474 So.2d 140, 141 (Ala.1985). “ ‘The usual discretion vested in the trial court to control the extent of cross-examination is narrowed in proportion to the extent of the adverseness of the testimony of the witness and the value to the defendant of a disaccreditation of the witness.’ Hendrick v. State, 368 So.2d 576, 578 (Ala.Cr.App.), cert. denied, 368 So.2d 579 (Ala.1979).” Jenkins, 474 So.2d at 141.
Ivey was the State’s key witness and the only witness to implicate Myrick in the crimes charged. His credibility and veracity were directly in issue. Consequently, we hold that the trial court abused its discretion in limiting cross-examination and in disallowing the profferred evidence tending to show Ivey’s intoxicated condition and the evidence of his conduct following the second sale of marijuana and before he made his notes of that sale.
There was defense testimony that Ivey was at The Desperado Club and that he was intoxicated upon his return to the apartment. However, we cannot, under the circumstances of this case, conclude that such testimony rendered harmless the trial court’s refusal to allow the defense to prove what transpired after the second sale through Myrick’s own testimony and by the introduction of The Desperado Club membership book. The potential effect of the documentary evidence that Ivey was at The Desperado Club should not be underestimated. Compare Price v. State, 392 So.2d 1242, 1247-48 (Ala.Cr.App.1980), cert. denied, 392 So.2d 1248 (Ala.1981) (“ ‘[T]he written statement may well have erased whatever doubt the jury entertained concerning the credibility of the witnesses upon whom the People had to rely to prove the contents of the unwritten one[s].’ ”). Ivey’s notes were extremely important. Evidence that he was either mistaken about when he made his notes or intoxicated when he made them would tend to weaken his credibility and cast doubt on the accuracy of the contents of the notes themselves. Under the circumstances, Myrick has demonstrated that “the error complained of has probably injuriously affected substantial rights.” Rule 45, A.R.A.P. The State has not argued otherwise.
The judgment of the circuit court is reversed and this cause is remanded for a new trial.
REVERSED AND REMANDED.
TYSON, TAYLOR and PATTERSON, JJ., concur;
McMILLAN, J., dissents with opinion.