337 So.2d 31 (1976)
Earnest BALL
v.
STATE.
6 Div. 648.
Court of Criminal Appeals of Alabama.
May 4, 1976.
Rehearing Denied June 1, 1976.
*32 J. Knox Argo, Montgomery, for appellant.
William J. Baxley, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.
PER CURIAM.
First degree murder; sentence: life imprisonment.
Appellant was convicted of murdering a police officer in Tuscaloosa. The record on appeal consists of 765 pages. Defense pretrial motions and petitions included: petition for mental examination; motion for preliminary hearing; motion to dismiss/quash the indictment; motion for discovery; motion to require production and suppression; motion to conduct special voir dire examination; motion for reasonable bail; motion for a mistrial; and ten separate petitions for writ of habeas corpus for various purposes. Over 290 pages of the record were consumed with prehearing motions, evidence thereon, arguments, and rulings of the trial court, prior to the receipt of any evidence on the merits. The record was lengthy and the issues logion.
Briefly stated, the shooting occurred when police officers answered a radio dispatch to quiet a disturbance at the residence of the appellant's former wife, Mary Ball. On arriving at the residence, Mary Ball informed Officers Larry Wood and John Thomas that appellant had threatened to kill her and was in a back bedroom armed with a shotgun. She removed her children from the premises and asked the officers to go in and get the appellant out of her house. Her testimony shows that appellant had broken into her house on three separate occasions during that day; the last break-in resulting in the call to the police.
The officers entered the house with pistols drawn. Officer Thomas went down the hall ahead of Woods. Woods heard the door to the first bedroom open. He saw the muzzle of a shotgun appear from the bedroom and fire into Thomas. Woods said Thomas shouted, "Oh my God," then turned around and said, "I've been hit." Thomas then backed into the kitchen and sank to the floor and died.
The bedroom door then closed and Officer Woods fired two shots into the door and retreated to the living room. The evidence clearly established the commission of the offense of murder in the first degree and likewise established the appellant was the guilty party. The weight and sufficiency of *33 the evidence in this regard cannot be disputed.
During pretrial hearing on the myriad of defense motions, appellant attempted to prove that the arresting officers beat him, both at the scene of the shooting and at the police station. Officers testified that it was necessary to rush the bedroom and wrestle the gun away from appellant, which accounted for some minor abrasions. That matter being irrelevant to the issue of appellant's guilt vel non of murder, further discussion here is not appropriate. It is mentioned for purposes of background information.
On April 18, 1973, counsel for appellant filed a petition for mental examination of his client, alleging that he believed that the appellant, "may be insane now and/or may have been insane at the time of the alleged offense." In that petition, counsel specifically stated that he believed the appellant to have been suffering from paranoia at the time of the offense, and requested an order pursuant to Title 15, § 425, Code of Alabama 1940, transferring appellant to Bryce Hospital for a determination of his mental condition. The appellant was admitted to the state mental hospital on April 19, 1973. After examination and observation, a report was submitted to the court from three physicians on the Bryce Hospital staff. That report, in pertinent part, is as follows:
"After full study and observation since the date of admission it is the opinion of each of us separately, and our opinion jointly and collectively, that the said Earnest Ball is presently sane and competent. It is also our opinion that he was sane and competent at the time of admission in Bryce Hospital. It is our further opinion that he was sane and competent at the time of the commission of the crime for which he is charged. . . ."
The appellant was then ordered by the circuit court to stand trial.
The appellant had originally entered a plea of not guilty and not guilty by reason of insanity, however, he later insisted on withdrawing his plea of not guilty by reason of insanity. The trial court allowed withdrawal of that plea with the understanding that it could be reinstated at any later time during the trial. The plea of not guilty by reason of insanity was reinstated by the court on request of defense counsel, prior to trial.

I
On direct examination, Officer Larry Woods detailed the occurrence from the point of receiving the radio dispatch, through the shooting of Thomas and up to the point of his firing two shots into the door and his identification of the appellant. The State asked no further questions of Woods beyond that point in time.
On cross-examination, defense counsel questioned Woods on each detail of his direct testimony, however, when the cross examination went past the point where Woods testified that he fired the two shots and retreated back to his prior position, the District Attorney made the following objection:
"Judge, I'm gonna object to any further testimony beyond this. I think the res gestae has now been reached."
The trial judge then recessed the trial and allowed argument on the objection, in chambers, where the following occurred:
"THE COURT: Gentlemen, there has been extensive pre-trial hearings regarding the arrest, capture, incarceration, et cetera, of the Defendant, all of which as a matter of sequence of times starts to evolve to the point which is now before the jury. I take it that Mr. Lackey is suggesting to the Court that that's not relevant, and I take it that Mr. Knowles is suggesting that it is relevant. Am I correct on your positions?
"MR. LACKEY: Actually, if the Court please, we're notJudge, that's close, but I'd like to state for the record that it isn't really at this point, that we really have still another delay, because if this man testified, he will testify that having secured his position he then left his position, went to the front door, spoke to *34 some officers out there, gave some directions; then came back to his position while some more people back through the door, and that quite a significant period of time passed before anything else happened involving the entry of that room, and I'm saying that the entry of that room no longer has anything to do with the crime, or with the event, if you will, but that now this has to do with taking custody of the malefactor, and therefore, that inasmuch as this has no relationship whatsoever to thesince the taking into custody has nothing in the world to do with the events which resulted in the death of Officer Thomas. Then they're beyond res gestae and therefore have no basis in fact for being in the case, and that's the basis for my objecting . . ."
The defense argument in pertinent part was as follows:
". . . We think it's relevant as within the res gestae and Mr. Lackey is absolutely correct that we don't have much interest in showing that he went to the door and talked to an officer, but we do have some interest in showing what happened after he came back, both his action and the other police officers' actions and Mr. Ball's actions, and I think it has relevance and is material and competent to the question of self-defense, and also probably to the question of insanity. The second ground is that we think we should be able to continue this line of questioning, to further impeach Mr. Woods. We expect to show that he gave further inconsistent statements concerning what happened after that and that tends to show that he was wrong about what happened. . . ." (Emphasis supplied.)
The record further shows:
"THE COURT: Really the only thing I could see in the whole matter is that if we go into that, then we're no longer trying what we have before us; we're trying a civil rights suit that would be more appropriate to be brought under the Civil Rights Act, and whether or not the Defendant's rights, as a matter of his civil rights as a human being, were violated or not, and not the question of whether or not he is guilty as charged in the indictment, or innocent; that's not the question that's being presented.
"MR. DRAKE: That's not what we intend to show.
"THE COURT: In addition, I feel that the events in the bedroom being immaterial to the question of guilt or innocence or anything, and not probative of that questionthen if you were to seek to show that that I would have to agree with the State's position that you would be laying groundwork on immaterial points on which to attempt to impeach officers on immaterial points, and if Mr. Lackey had opened the door, both factually and actually, then naturally you could impeach on immaterial points if the other side had brought up those immaterial points.
"THE COURT: I have to feel that somewhere the Court has to draw a line on what the issues are before the jury, and I think it would be more appropriate that if the defense wishes to present these issues to a jury, it should be in another case and on other points, and not on the question of guilt or innocence; in another Court.
"MR. DRAKE: I take it you would also not allow the Defendant to testify as to those events?
"MR. LACKEY: I'd object to it.
"THE COURT: As to those events in the bedroom, it's true. I'm saying that as far as I'm concerned, I've heard all of this testimony before on several occasions; therefore there's no need asking y'all to, you know, make an offer to show or something like this because I've already heard it. . . . [The court reporter's note shows here that the trial judge was referring to pretrial hearings, which was not evidence presented in the presence of the jury.]

. . . . .

*35 "MR. DRAKE: For the record here, have you sustained the objection?
"THE COURT: Yes, sir. I have sustained.
"MR. KNOWLES: Well, as the older hands around would say, we except!"

A. THE RIGHT OF CROSS-EXAMINATION
Article 1, § 6, Constitution of Alabama 1901, guarantees to the accused in all criminal proceedings the right "to be confronted by the witnesses against him." As early as 1908, the Supreme Court of Alabama held that such right "imports the constitutional privilege to cross-examine the opposing witnesses." Wray v. State, 154 Ala. 36, 45 So. 697. Wray cited the 1888 case of Tate v. State, 86 Ala. 33, which put the same construction on identical verbage used in the prior Constitution of 1875. Likewise, Title 7, § 443, Code of Alabama 1940, guarantees the right of a thorough and sifting cross-examination in every case.
The Sixth Amendment to the United States Constitution has been applied to the states, and it has been consistently held in the federal courts that the right of cross-examination is included in the right of an accused to be confronted with witnesses against him. Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923; Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297; Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347. However, Alabama, by its constitution and statutes protected the right of cross-examination long before that federally protected right was held to apply to the states.
The latitude and extent of cross-examination has been held to be subject to some limitation. Both state and federal decisions vest trial judges with the limited discretion to cut off questions on cross-examination which: (1) are repetitions, (2) concern wholly collateral matters, (3) are irrelevant, or (4) are harassing, annoying or humiliating. Connell v. State, 294 Ala. 477, 318 So.2d 710; Cox v. State, 162 Ala. 66, 50 So. 398; Wright v. State, 49 Ala.App. 539, 274 So.2d 95; U.S.C.A. Amend. 6, notes 1091, et seq.
Even though trial judges are vested with certain discretion, the right of cross-examination is a fundamental constitutional right, and in cutting off cross-examination, a trial judge treads on extremely perilous ground. Upon proper objection by the accused, as was the case here, appellate courts should closely scrutinize any limitation placed upon that right.

B. THE ENGLISH RULE
The prosecution in the instant case attempted to limit the defense on cross-examination to the matters brought out on Officer Woods' direct examination. Such limitation is not permissible in this state. Alabama follows the so-called "English rule" that cross-examination is not limited to matters brought out on direct examination. Cross-examination extends to all matters within the issues of a case. International Brotherhood of Teamsters, etc., v. Hatas, 287 Ala. 344, 252 So.2d 7; Lewi's v. State, 43 Ala.App. 16, 178 So.2d 649; Madden v. State, 40 Ala.App. 271, 112 So.2d 796, cert, denied 269 Ala. 697, 112 So.2d 800. The limitation, by the trial judge, would be reversible error, unless no relevant matter then existed which could have been subject to inquiry on cross-examination.

C. RELEVANCY
The trial court, in cutting off cross-examination, apparently believed the cross-examination was being directed into the irrelevant area of whether the arresting officers had beaten the appellant. Also, the trial judge stated that the defense was attempting to impeach on an immaterial issue. Since the trial judge had gone through lengthy testimony from numerous witnesses, both in chambers and in the presence of the jury, both on motions and on the merits, it is not unlikely that some confusion may have existed as to just what evidence had or had not been presented for the jury's determination. Up until this point in the trial, the court had done a masterful job of *36 directing the proceedings and in preventing a determined defendant from creating error.
Both the State and the appellant base their arguments upon the theory of res gestae. The State says that the res gestae does not encompass events, after the commission of the offense, such as the arrest of the accused. The appellant contends that the definition of res gestae is sufficiently broad to cover such events when they are so closely connected with the main transaction as to form one entire transaction.
Although Alabama courts continue to base decisions on the theory of res gestae, the modern trend among legal scholars seems to favor disregarding that term in favor of less nebulous legal principles. See: McCormick on Evidence (2d ed.), § 288. The following commentary is made in Morgan, A Suggested Classification of Utterances Admissible as Res Gestae, 31 Yale L.J. 229:
"The marvelous capacity of a Latin phrase to serve as a substitute for reasoning, and the confusion of thought inevitably accompanying the use of inaccurate terminology, are nowhere better illustrated than in the decisions dealing with the admissibility of evidence as `res gestae.' It is probable that this troublesome expression owes its existence and persistence in our law of evidence to an inclination of judges and lawyers to avoid the toilsome exertion of exact analysis and precise thinking."
McCormick states that, "[t]he ancient phrase can well be jettisoned, with due acknowledgment that it has served well its era in the evolution of evidence law."
Whether we use the Latin phrase or the verbiage commended by McCormick, to allow or disallow evidence of acts or utterances reasonably connected in time and space to the offense, is of little consequence. In either instance, we must determine if the subject of the proposed cross-examination could, under any theory of the defense, be relevant.
In the instant case, the subject of the proposed cross-examination concerned transactions which occurred at the scene of and almost immediately after the shooting. In cutting off cross-examination as to such transactions, the trial judge has, in effect, determined that no material facts existed which could be made the subject of inquiry.
The defendant's sanity at the time of the shooting was in question via his plea of not guilty by reason of insanity. Any evidence concerning his actions and demeanor at the time of the shooting would have a material bearing on the issue of sanity and would thus be relevant.
Inquiry into the defendant's mental state, as evidenced by his words, actions, demeanor and expression, cannot be cut off as of the instant his bullet hit the mark and the crime was completed. Our Supreme Court in George v. State, 240 Ala. 632, 200 So. 602, stated:
"Evidence to show insanity is not confined to evidence of the mental condition of the accused at the instant of the act, though whatever facts are adduced must tend to show the mental state at that moment. By outward acts we read the thoughts, the motives and the emotions, and as one's acts conform to the practices of people of sound mind or contrast therewith we form our judgment of sanity or insanity. Evidence is competent to prove conduct and language at various times and places indicating an unhealthy mental condition, and the more extensive the view the safer is the determination reached."
In Hall v. State, 248 Ala. 33, 26 So.2d 566, at p. 568 the Court said, at p. 36:
"And our decisions are uniform to the effect that the issue of insanity gives much latitude, both to the defendant and the State, for the introduction of evidence of defendant's acts, declarations, and conduct, prior and subsequent to the alleged crime. . . ." (Emphasis supplied.)
In Hall, the defense offered to show by the jailor that the defendant had a fit in *37 jail, and the trial court ruled: "...
`You are asking about a time since the crime was committed. I will sustain the objection.' . . ." The Supreme Court held such to be reversible error. In Barbour v. State, 262 Ala. 297, at p. 303, 78 So.2d 328, at p. 333, the Supreme Court stated:
"It has long been held that `wide latitude' is allowed both the defendant and the state in inquiries into a person's mental state when an issue as to the sanity of such person is presented. . . . These inquiries, however, are subject to the necessary limitation that the acts, declarations and conduct inquired about must have a tendency to shed light on the accused's state of mind when the act for which he is being tried was committed.. . ." (Citations omitted.)
Insanity is a defense which must be proved to the jury, regardless of the written opinion of state psychiatrists to the trial court to the effect that the accused was sane. Inquiry during cross-examination touching upon the question of appellant's sanity, is proper and testimony relating thereto is for the jury's consideration. McAllister v. State, 17 Ala. 434; Moody v. State, 267 Ala. 204, 100 So.2d 733.
Cross-examination for other purposes may have also been relevant, although we have limited our opinion basically to the question concerning sanity. Counsel for appellant argued to the trial court that further cross-examination of Officer Woods was necessary, stating inter alia:
"We expect to show that he gave further inconsistent statements concerning what happened after that and that shows tends to show he was wrong about what happened.. . ."
The trial court's ruling, therefore, prevented the defense from questioning Officer Woods concerning any statements he may have made following the shooting. If Woods gave a different version of what transpired in statements following the shooting than he gave in his direct testimony, the limiting of cross-examination precluded that inquiry. It is an established rule that an accused has the right to cross-examine a witness on any matter testified to on his direct examination for the purpose of testing his memory, credibility, knowledge and accuracy. Green v. State, 258 Ala. 471, 64 So.2d 84. Thus, appellant was denied that right by being unable to cross-examine Woods concerning any different version of the shooting he may have related to others following the occurrence.
The trial judge, in allowing cross-examination to continue, lessens the chance of denial of a fundamental right and yet would not relinquish the court's authority to rule on the relevancy of evidence as objections were made to specific questions. In the instant case, the trial court could have easily allowed cross-examination to continue, allowing questions concerning the accused's demeanor, but disallowing clearly irrelevant questions dealing with actions taken by other officers not connected in time or distance with the crime.

II
It is unnecessary in reaching the final result of this decision to rule on the multitude of baseless motions and assertions of the appellant. However, we make certain findings here so that the record on retrial will not be overburdened with absurd allegations as was the instant record.
A. There is no right in Alabama to a preliminary hearing after indictment. Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387; Ex parte Campbell, 278 Ala. 114, 176 So.2d 242.
B. Statements of police officers which were withheld from both the defense and the prosecution were supplied during the course of the instant trial and thus their prior suppression is no longer an issue on retrial.
C. We find that appellant was well represented by appointed counsel at trial and by different appointed counsel on appeal. Their defense of appellant was made considerably difficult by his alternating insistence upon self-representation and then insistence upon assistance of counsel.
*38 On January 22, 1973, appellant notified the court that he was meeting with his family the next day concerning retaining of counsel. On January 29, he informed the court he was retaining private counsel, whom he named, and needed no appointed counsel. On March 19, appellant and his family notified the court that they had a public fund raising drive in progress and would report to the court on March 26 as to retaining counsel. On April 11, 1973, on arraignment, appellant was represented by retained counsel. On April 18, appellant moved for a mental examination, which was granted and he was placed in the state mental hospital for examination until he was returned to the county jail on June 27, 1973. On September 10, 1973, appellant informed the court that he had dismissed retained counsel and would defend himself.
In view of the constitutional right to be represented by counsel as opposed to the right of self-representation set forth in Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562, we find that the trial court ably and amply protected both rights. In allowing appellant to proceed pro se (after determining the prerequisites required by Faretta) the trial court also required appointed counsel to sit with appellant and render whatever assistance appellant should request from time to time.
Appellant, therefore, was not denied the right to counsel. The delay in obtaining counsel and in going to trial on the merits are the consequence of appellant's own actions and not of the trial court. Appellant was not denied a right to a speedy trial. Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101.

III
The evidence adduced on the merits supports the verdict of the jury and it is with reluctance that we perform the necessary duty of remanding this cause for a new trial. The guilt of appellant is apparent from the record, but even so, he was denied one of the most fundamental rights under our state and federal constitutions, the right to fully cross-examine witnesses against him. To quote from Watts v. State, 282 Ala. 245, 210 So.2d 805:
"The worst wretch that walks the earth is entitled to a fair trial, for the law is superior to all persons. As much as we may regret some results of the law, the law must be preserved if this constitutional democracy is to survive."
REVERSED AND REMANDED.
All the Judges concur, except DeCARLO, J., who dissents.
DeCARLO, Judge (dissenting).
I agree that limiting appellant's cross-examination could deny basic constitutional rights.
However, as pointed out in the majority opinion, the right of cross-examination has its bounds. The court noted that the trial judge is vested with the discretion to limit cross-examination. They outlined the permissible reasons available to the judge for limiting such examination. Among these were, cross-examination concerning collateral matter or irrelevant material.
Our Supreme Court in Phoenix Insurance Co. of New York v. Leonard, 270 Ala. 427, 119 So.2d 217, adopted a statement by the distinguished Judge J. Russell McElroy in his excellent work, The Law of Evidence in Alabama (2nd Ed.) Vol. 2, § 21.01. It elaborates on the right of a trial judge to exclude evidence if the probative value is outweighed by other considerations.
The pertinent part of the opinion reads:
"`The judge may in his discretion exclude evidence if he finds that its probative value is outweighed by the risk that its admission will (a) necessitate undue consumption of time, or (b) create substantial danger of undue prejudice or of confusing the issues, or of misleading the jury, or (c) unfairly surprise a party who has not had reasonable ground to anticipate that such evidence would be offered.'"
The competence of any evidence in the final analysis depends upon whether it is *39 likely to advance the search for truth. This does not inevitably follow from the fact that it is rationally relevant. As was said in U. S. v. Krulewitch, 2 Cir., 145 F.2d 76:
". . . (T)he question is always whether what it will contribute rationally to a solution is more than matched by its possibilities of confusion and surprise, by the length of time and the expense it will involve, and by the chance that it will divert the jury from the facts which should control their verdict . . ."
At the time the appellant's cross-examination of Officer Woods was restricted the court had before it the indictment of charges and the attendant pleas. The trial judge also had the benefit of hearing the extensive pre-trial motions, concerning the arrest, capture and incarceration, having presided over them and having watched each unfold. Armed with this knowledge, he knew where the questions and subsequent examinations were leading.
In fact, during the hearing, concerning whether the appellant's examination would be allowed to continue, the judge commented:

. . . . .
"If we go into that, then we're no longer trying what we have before us; we're trying a civil rights suit. . . .
". . . (Y)ou would be laying groundwork on immaterial points on which to attempt to impeach officers on immaterial points . . .
". . . I have to feel that somewhere the Court has to draw a line on what the issues are before the jury . . ."
I do not believe that the limitation placed on this appellant's cross-examination in any way deprived him of asserting his insanity defense. In fact, the record reflects that testimony was elicited concerning this man's sanity. Clearly any testimony concerning the actions by the police after Woods fired into the door, would have little bearing on the point. It would only tend to prejudice and confuse the jury.
It is my opinion that the prejudicial effect would outweigh any probative value this evidence would have on the point of insanity, assuming it had any.
In my judgment it was obvious that the judge endeavored to confine the testimony within the framework of the charges against this appellant. He attempted to avoid the danger that such evidence would unduly prejudice the jury and confuse the issues they were to decide.
In view of the foregoing, I do not believe this was an unwarranted limitation on appellant's right of cross-examination.
I respectfully dissent.