DeCARLO, Judge.
John G. Laing was indicted and later convicted by a jury for unlawfully selling 3, 4 methylene dioxyamphetamine (MDA), in violation of the Alabama Controlled Substances Act, Alabama Code, § 20-2-70 (1975). His punishment was fixed at two years in the Montgomery County Jail.
Retained counsel represented the appellant at trial and now represents him on this appeal.
The appellant was a former undercover officer with the vice and narcotics division of the Montgomery Police Department. At the time of his arrest, he was employed in that capacity.
Steve Brantley, a member of the Montgomery Police Department serving with the internal affairs unit, testified that, on January 12, 1979, he received a telephone call from Katherine Ortega, an informant. After that conversation which concerned the appellant, Brantley contacted Cpl. Tom Parnell. The next night they installed an electronic monitor on Ortega’s telephone. That same night a conversation between Ortega and the appellant was recorded. The following night they recorded a second conversation between Ortega and the appellant. In that conversation, the appellant wanted Ortega to set up a meeting with a prospective drug purchaser.
Later that same evening, Brantley and Parnell returned to the Ortega apartment with Officer Faulkner. On that occasion, Brantley had a marked one hundred dollar bill, which was police money provided by Officer Parnell. Brantley made a xerox copy of the bill, then gave it to Ortega. Also, he installed a body mike transmitter in her purse. According to Brantley, Ortega left the apartment and walked toward the Mobile Highway. Subsequently, he heard two voices, one of which he identified as the appellant’s and the other as that of Ortega. Brantley stated that he heard the appellant ask Ortega if she had found a buyer and she answered, “Yes.” After fifteen minutes she returned to the apartment with two packages. The next day they were taken to the State toxicologist’s office.
Montgomery Police Officer Margaret Faulkner testified that, on January 14, *1156 1979, she conducted a “strip search” on Ortega. At that time, Ortega had removed all her clothes and Officer Faulkner determined that she had nothing hidden on her body. Faulkner testified that she saw Ortega leave the apartment and was there when she returned and went to the bedroom. Faulkner stated that when she returned she had a brown envelope containing a plastic bag with something wrapped in aluminum foil.
Allen Raymond Adair of the Department of Forensic Sciences stated that he had examined the contents of the bag turned over to him by Brantley. Adair identified the white powder as 3, 4 methylene diox-yamphetamine, also known as MDA.
Lt. J. D. Foster, who participated in the investigation involving the appellant, stated that, on January 14, 1979, Maj. C. D. Sher-lin announced that an investigation concerning the appellant was under way. The investigation involved the sale of evidence which had been taken from police headquarters. Foster explained that a quantity of “MDA” had been seized pursuant to a search warrant executed in another case and that the appellant had participated in the search.
Foster, Capt. Arnette and Maj. Sherlin went to the apartment of Miss Paula Shaver in Montgomery, Alabama, where they found the appellant. Upon entering the apartment, Lt. Foster told the appellant that they were there for the purpose of conducting an investigation. At that time, Foster advised the appellant of his constitutional rights. At the request of the officers, the appellant handed his billfold to Foster. He removed a one hundred dollar bill bearing the same serial number as that on a “photostatic copy” of a one hundred dollar bill held by Capt. Arnette.
During further questioning, Foster stated that he did not authorize the appellant to remove the “MDA” from police headquarters, nor did he authorize him to sell it.
During cross-examination, Foster admitted that he was familiar with a verbal order that no investigative personnel were to use Ms. Ortega as an informant or have any contact with her. According to the order, any information which Ortega might have was to be given to Maj. Sherlin. Foster ‘added that the order had been issued in early November, 1978.
When the appellant was taken to the police station he was asked if he knew “what could happen to police officers that went to the penitentiary.”
Katherine Ortega, also known as “Ti” Ortega, met the appellant on January 14, 1979 at a Seven-Eleven store near her apartment. She testified that the appellant gave her a “baggie” which contained a white substance identified by him as “MDA.” In return, she gave him a one hundred dollar bill.
During cross-examination, testimony elicited from Ortega showed that she had been involved in drugs and had been arrested, but never prosecuted. She had operated a massage parlor where prostitution was practiced.
During further cross-examination, Ortega acknowledged that she first contacted the internal affairs division of the Montgomery Police Department on January 12, 1979. In the conversation with the appellant, which was not recorded, the appellant told her that “he was going to have an opportunity to get some stuff.” Ortega explained that she and the appellant were friends and that, prior to the conversation in January, the appellant had mentioned drugs, but she had not taken him seriously.
Ortega testified that in the conversations she had with the appellant from January 12 to January 14, 1979, she told him that she had the buyer for the drugs.
She further testified that, when she arrived at the “pack a sack” store, the appellant walked out and got into her car. She acknowledged that, at that time, she gave Laing the one hundred dollar bill.
Montgomery Police Officer Thomas Parnell of internal affairs testified that he and Brantley received a telephone call on Friday, January 12, 1979 from Ortega. According to Parnell, on the morning of the *1157 13th the appellant called Ortega and offered to sell her “some" drugs. Parnell recalled that on the evening of January 13, 1979, the conversation between the appellant and Ortega was recorded. Parnell testified that he observed the appellant drive up in a black police car and go inside the Seven-Eleven store on the Mobile Highway. He subsequently saw Ortega arrive and the two get into the car together and drive onto the Mobile Highway. Parnell recalled that Ortega had a transmitting device concealed in her purse. He heard the conversation between Laing and Ortega, but could not understand what they were saying.
Parnell testified that, at the time he took the statement from the appellant, there was no ’ one else present except Sgt. Foster. Parnell stated that no one threatened, abused, coerced or induced the appellant to make the statement.
During cross-examination, Parnell stated that he did not advise the appellant of his constitutional rights; however, Parnell knew that the appellant had previously been advised of his rights.
At the end of Parnell’s testimony, the State rested its case and the appellant, at that time, moved to exclude the State’s evidence. The motion was denied, and the appellant called approximately eight witnesses who testified that the appellant’s general reputation was good, that he was truthful and that he was a very good police officer.
Charles Armstrong and Joseph Dorrill, former police officers with the Montgomery Police Department, testified that Ortega’s general reputation for truth and, veracity was bad and that the appellant had a good general reputation and a good reputation for truth and veracity.
The appellant testified that Ortega had called him on January 8,1979, and told him, “If I could get my hands on some dilaudid, I could probably sell it.” According to Laing, there were subsequent conversations on January 10,1979, and January 13,1979. On January 14, 1979, he had another telephone conversation with her. The appellant testified, “She had a buyer for the speed and she asked me if I could meet her at the Seven-Eleven store on the Mobile Highway around ten-thirty.”
Laing went to the store and met Ortega, who handed him a one hundred dollar bill. He, in return, handed her a small packet of white powder and an aluminum packet which contained a non-controlled substance. The appellant recalled that, about 2:30 A.M., Foster, Sherlin and Arnette came to the apartment. Foster read the appellant his constitutional rights. He was then asked to hand over his wallet, from which the one hundred dollar bill Ortega had given him was removed. Laing recalled that he was taken to police headquarters and, while in Chief Burke’s office, was told by Burke, “John I want you to cooperate with us. You know what happens to police officers when they go to the penitentiary.” Laing responded, “Yes, sir, I know what happens to police officers when they go to the penitentiary, especially vice officers.”
The appellant explained that his purpose in dealing with Ortega was “to set her up as an informer.” He admitted violating the order not to deal with Ortega, but insisted that he was attempting to place her “into position where I could have something to hold over her in case she ever wanted to turn on me, which I knew she had done in the past.”
The appellant testified that, after his conversation with Chief Burke, he gave his statement to Parnell and admitted that, “About ninety-eight percent of it was true.” When asked why he had not informed Chief Swindall or Chief Burke about the conversations with Ortega, the appellant replied, “I hadn’t accomplished what my goal was. I didn’t tell anybody what I was up to.”
Laing admitted that he had removed the drugs from the evidence room and that he knew such action was impermissible. Also, he admitted that on January 12, 1979, he had called Ortega. He said, “The purpose for not advising my superiors was the fact that I was going to try to set her up and *1158 get information from her and establish some kind of rapport with her so that I could go to my superiors and explain to them what I had done.”
Laing admitted, “I was read my constitutional rights at the time they picked me up, but I was not asked to sign a rights form until the following day I believe it was.”
I
The first issue raised by the appellant was whether the court erred in admitting into evidence a statement made by the appellant at police headquarters on the night of his arrest. He argues that the statement was induced by a threat made by Deputy Chief Burke. According to Foster, Burke had asked the appellant “if he knew what could happen to police officers that went to the penitentiary.” The appellant’s version is similar. During the trial, the appellant explained he understood the statement to mean that, “A vice cop in the penitentiary is going to live about three hours.”
We note from the transcript that, at the time Laing made his statement, the only police officers present were Parnell and Foster. Burke was not present at that time.
The test of voluntariness of a confession has been outlined in Guenther v. State, 282 Ala. 620, 213 So.2d 679. The court stated:
“The true test of voluntariness of extrajudicial confessions is whether, under all the surrounding circumstances they have been induced by a threat or a promise, express or implied, operating to produce in the mind of the prisoner apprehension of harm or hope of favor; and if so, whether true or false, such confessions must be excluded from the consideration of the jury as having been procured by undue influence.”
From Webster’s Third New International Dictionary (1976), we find that a threat is an “expression of an intention to inflict loss or harm on another by illegal means and especially by means involving coercion or duress of the person threatened.” In our view, Burke’s statement could have done nothing more than to impress upon Laing the seriousness of his situation.
Nowhere in the record does it appear that the appellant was told he would be spared a penitentiary sentence if he cooperated, or would suffer any harm if he did not. Burke’s statement in no way was coercive, nor was it suggestive of any consequences which might follow if the appellant did not cooperate. The appellant’s state of anxiety did not stem from fear of what might happen to him if he made or did not make the statement. His anxiety resulted from the fact that he had been caught. The testimony of Parnell, who was present when the appellant made his statement, makes it clear that he was not threatened or intimidated. The appellant stated unequivocally that he understood his constitutional rights, and in fact, said, during the trial, that he could recite them. Therefore, after examining the totality of the circumstances, it is our judgment that the statement given by Laing was voluntary and not coerced by any threat.
II
The appellant complains that the trial court denied him his right to cross-examine the witnesses against him.
Appellant relies on Buckelew v. State, 48 Ala.App. 411, 265 So.2d 195. In Buckelew, Judge Cates reiterated the words of § 12-21-137, Code of Alabama 1975, which reads as follows:'
“The right of cross-examination, thorough and sifting, belongs to every party as to the witnesses called against him.”
In Powell v. Powell, 285 Ala. 230, 231 So.2d 103, which construes T. 7, § 443, Code of Alabama 1940, Recompiled 1958, now § 12-21-137, Code of Alabama 1975, the Alabama Supreme Court wrote:
“This section must be reasonably construed. It does not deprive the trial judge of discretion reasonably exercised to limit the range of cross-examination in respect to collateral and irrelevant matter. The undue and unnecessary consumption of time in the trial of causes, *1159 and the avoidance of multiplied collateral and irrelevant issues is committed in the first instance to the wise discretion of the trial judge.”
In Cox v. State, 162 Ala. 66, 50 So. 398, the Supreme Court stated:
“The latitude and extent of such cross-examination, however, is a matter that must, of necessity, rest largely, if not exclusively, within the sound discretion of the trial court, and, so long as that discretion is not abused, the action of the trial court will not be revised on appeal.”
Additionally, in Atwell v. State, Ala.Cr.App., 354 So.2d 30, this court stated:
“The control of cross examination is within the discretion of the trial judge only after a party has had an opportunity substantially to exercise his right of cross examination. Dixon v. United States, 333 F.2d 348 (5th Cir. 1964). However, the trial court has the discretion to reasonably limit the range of cross examination in respect to matters which are repetitious or argumentative. A trial is not meant to be an eternal phenomenon. Buckelew v. State, 48 Ala.App. 411, 265 So.2d 195 (1972). Trial judges have unlimited discretion to cut off questions on cross examination which are repetitious, concern wholly collateral matters, are irrelevant, or are harassing, annoying, or humiliating. Ball v. State, Ala.Cr.App., 337 So.2d 31, cert. quashed, 337 So.2d 39 (1976).
“The right to a thorough and sifting cross examination does not entitle a party to repeat questions that have already been definitely and fully answered. Proctor v. State, Ala.Cr.App., 331 So.2d 828 (1976).”
See also Gamble, McElroy’s Alabama Evidence, § 438.01 (1977).
The transcript of evidence revealed that appellant placed before the jury a substantial amount of information concerning the police’s relationship with an informant. Also, there was a considerable amount of testimony labeling Ortega’s general reputation for truth and veracity as bad, and labeling her as a drug user and a prostitute. The appellant was able to show that his intention m dealing with Ortega was “to hold something over her head” so that he could use her as an informant. We do not believe, under the circumstances, that the trial court infringed upon the appellant’s right to a “thorough and sifting” cross-examination.
Ill
The appellant asserts that the trial court committed reversible error in allowing the prosecution to elicit testimony of other criminal activity. Counsel for appellant argues that the trial court permitted the State to pursue the matter of a loan which the appellant had made to Ortega, for the purpose of showing that Ortega intended to operate a house of prostitution.
We note from the record that the appellant did not object to this testimony on the specific ground that the evidence tended to show his guilt of other offenses. This contention was made for the first time on appeal.
The transcript of evidence shows that the appellant testified that he had made the loan to Ortega to “set her up, and gain her confidence.” Also, the record shows the following:
“Q. And isn’t it true that you knew that she was going to use that money to rent an apartment to set up a house of prostitution?
“MR. DeMENT: Objection.
“THE COURT: Overruled.
“A. I knew she was going to use the money to rent an apartment.
“Q. Isn’t it true you knew that she was going to set up a house of prostitution?
“A. She had mentioned that to me, but I had no facts to back it up.”
Prior criminal activity may be shown where it relates to motive and intent to commit the crime presently charged to the accused. Lucy v. State, Ala.Cr.App., 340 So.2d 840. We find that the evidence, which tended to show prior criminal activity involving the appellant and Ortega, was admissible to show the appellant’s motive and intent in the present case.
*1160 The appellant testified that he had loaned the money to Ortega “to set her up” even though he was aware of the departmental order to have no contact with her. It is obvious that the appellant’s motive and intent in making the personal loan to Ortega was to keep secret his violation of the departmental order. Under these circumstances, we believe that the making of the loan bears directly on the appellant’s intent to commit the present offense. Therefore, we find no error in receiving the testimony into evidence.
IV
The evidence presented by the State was sufficient to raise a question of fact for the jury, and such evidence, if believed, was sufficient to sustain the conviction; therefore, the trial court did not err in overruling the motion to exclude and the motion for a new trial.
We have carefully examined the record and find no error prejudicial to appellant. Therefore, the judgment of conviction by the Montgomery Circuit Court is due to be affirmed.
AFFIRMED.
All the Judges concur.