64 So.2d 84

## GREEN v. STATE.
### 6 Div. 440.

Supreme Court of Alabama.
March 13, 1953.

Chas. E. Tweedy, Jr., Jas. L. Beech, Jr.,. and Still Hunter, Jasper, and John Posey,. Haleyville, for appellant.

Si Garrett, Atty. Gen., and L. E. Barton,. Asst. Atty. Gen., and Thos. M. Haas,. Montgomery, of counsel, for the State.

SIMPSON, Justice.

Claud Green, alias Cotton Green, was convicted of murder in the first degree and received a sentence of life imprisonment. This appeal is from that sentence and judgment.

On a painstaking study of the record, the court has reached the conclusion that certain errors occurred in the trial which necessitate a reversal of the judgment.

Following is a brief summary of the pertinent evidence: The victim, Mrs. Ada Boshell, aged seventy-three years at her death, lived alone in a rural area in Winston County on the Nauvoo-Double Springs road. Her nude body was discovered by a neighbor, one Joe Spain, about 5:30 Saturday morning, September 8, 1951, lying on the floor near the front door in the front room of her home. The homicide was horribly sadistic. Her throat had been cut, almost from ear to ear, with some dull instrument such as a handsaw. Her clothing had been set fire to and the left side of her body had been burned, there being third degree burns about the middle portion. Her face and other parts of the body contained various bruises and scratches and her sexual organs had been considerably mutilated.

Dr. C. V. Brooks, Assistant State Toxicologist, had examined the body a few hours after it was discovered and testified as to its condition. With respect to the private organs, he testified the vagina was standing open, exuding blood and mucous. There were lacerations and scratches around the orifice and extending into the vaginal canal, one scratch about one-sixteenth of an inch deep running "from the orifice to the deepest portion of the vagina." He could not say whether or not a rape had occurred or that a male organ had produced some of the injuries, but he was definitely of the opinion that one and probably two of the lacerations were caused by some hard in-animate instrument. She had been dead more than twelve hours before his examination.

Testimony of witnesses regarding the physical surroundings showed there was a considerable amount of blood around the body, bloody heelprints leading from the body back into the back of the house, where there was a refrigerator on the door of which there were bloody handprints. Something over $90 in greenbacks was found wrapped up in a tobacco sack under a chair near the deceased's head. One piece of evidence which evidently played a most material part in the conviction of the defendant was a stick found in one of the back rooms of the house on which there was blood. There were bloody handprints on the middle portion of the stick and at one end of the stick extending up some six inches there was also blood. It was presumably the State's theory that the stick was used to produce some of the injuries to the deceased's private organs. The toxicologist testified that the blood on the middle portion of the stick was human blood, but that he could not definitely say that that on the end of the stick was human blood because it had apparently been diluted or some of it washed off. Fingerprints were tried to be lifted from the stick, as well as the refrigerator, but none appeared from the tests.

There were no eye witnesses to the crime. Following are the circumstances which tended to connect the defendant with it: He lived several miles from the home of the deceased, about nine miles by road and four through the woods. He was seen in the vicinity of the deceased's house the day before her body was found, carrying a stick which four of the State's witnesses identified as the stick with the blood on it found at the deceased's home. These witnesses were Clarence Spain, who lived very near deceased's home; Spain's brother-in-law, Massey; and Richard McGough and his son, Wesley McGough. The McGoughs lived about three-quarters of a mile down the road from Spain's house. Defendant bought some whisky at Spain's in Spain's presence from his brother-in-law, Massey, about 10:30 Friday morning, September 7,

and later went on down the road toward the McGoughs. He reached the McGoughs' about twelve noon and stayed at the McGoughs' until mid-afternoon. The two McGoughs testified that defendant and young Wesley McGough then went to deceased's home, where Wesley proposed to try to sell her some chickens. According to the McGoughs, defendant made some statement at their house about the deceased having money and carrying it in her bloomer leg, and when Wesley and defendant arrived at Mrs. Boshell's home, after staying around there some time and talking to Mrs. Boshell, Wesley testified that defendant said, "We ought to shack up with her." After staying around the premises of the deceased for some time, Wesley testified the two of them went into the pasture to take another drink of whisky and that he, Wesley, then went back to Mrs. Boshell's home to continue talking about selling the chickens and when he returned to where he had left the defendant, the defendant had gone and was seen no more by this witness (or any of the others) that day. Wesley then went home and arrived well after dark. The body was found the next morning.

Another State's witness testified about a statement made by defendant about a month before Mrs. Boshell was killed, when he and defendant were passing her home in a truck, that Mrs. Boshell "had a right smart of money, and if I would take him back over there, he would get it, and he said if we didn't get any money, we could get a load of cattle. He said he would knock her in the head." This witness was severely impeached by showing several convictions of crimes involving moral turpitude.

When the officers searched for the defendant the day the body was found, he could not be located, but he surrendered to the sheriff of Walker County some eight days later, at which time he had some scratches on his face which the doctors testified appeared to be "fingernail scratches." The toxicologist testified that the fingernails of the deceased were worn off beyond the meat of the fingers and that his examination failed to show any human skin or flesh under the nails.

The defendant denied all of the incriminating circumstances except he did admit he had a stick that day, but testified it was not the one in evidence (a gum) but was a dogwood stick, which he left at the McGoughs' house when he came on back through the woods and went home. He denied going to the Boshell home, but testified he and both the McGoughs went up the trail toward her home and that he left the McGoughs going in the direction of Mrs. Boshell's home something after 3 o'clock in the afternoon and that he proceeded on through the woods to his home, arriving about sundown; that the next day about daylight he went fishing and when he showed up back at his house it was about dark and he spent the night there that night; that the next morning, Sunday, his nephew, Wesley Dutton, came over and informed him of his being accused of the murder of Mrs. Boshell and of people hunting him with guns and that he therefore "stayed in the woods" until he could get to the sheriff of Walker County and surrender. He accounted for the scratches on his face from a broken razor used in shaving. This was corroborated by the testimony of several of his kinspeople.

The first error to be noticed is with reference to the cross-examination of Richard McGough and his son, Wesley McGough. Defendant was denied the privilege of fully cross-examining Richard McGough as to whether shortly prior to the death of Mrs. Boshell he had made certain statements showing hostility to her about her having taken his money and that he was going to get it back or kill her before he removed from her property, where he was living. The court also refused the defense the privilege of cross-examining Wesley McGough on whether he "had had a falling out with Mrs. Boshell." We think the court limited this right of cross-examination too strictly, to the prejudice of the defendant.

■ It is always competent on cross-examination to make such interrogation of a witness as would tend to test his interest, bias or prejudice or to illustrate or impeach the accuracy of his testimony. Both our appellate courts have approved the principle stated in 2 Wigmore on Evidence,

2d Ed., § 949, p. 332: "The range of external circumstances. from which probable bias may be inferred is infinite. Too much refinement in analyzing their probable effect is out of place." Louisville & N. R. Co. v. Martin, 240 Ala. 124, 198 So. 141, 144; Sowell v. State, 30 Ala.App. 18, 199 So. 900.

■ And the extent to which a witness may be cross-examined depends in some instances on the importance of his testimony. In Louisville & N. R. Co. v. Martin, supra, this court quoted with approval the following pertinent statement of principle from the note in 74 A.L.R. 1154:

"* * * a witness may be testifying in reference to matters peculiarly within his knowledge, and as to which contradiction is difficult, where the turn of a phrase may control the disposition of the case. In such instances, it is submitted, a very searching inquiry as to circumstances indicating the existence of intellectual bias, or of emotional hostility, should be allowed. * * *"

We have often made reference to § 443, Title 7 of our Code, which stipulates that "The right of cross-examination thorough and sifting, belongs to every party as to the witnesses called against him."

The cross-examination of the two McGough witnesses is governed by these principles. Their testimony was the most damaging given against the defendant. The evidence to connect the defendant with the crime was entirely circumstantial and it was their testimony more than any other which tended to this effect. They were the last ones who saw him on the afternoon of the night the murder was committed. It was they who stated he was in possession of the stick, identified by them as the one later found at the home of the deceased, when he separated from them going up the trail toward the home of deceased. In contradiction of this and as tending to cast suspicion on these two witnesses, the defendant testified he left the stick at the McGoughs' when he left going to his home and that on leaving them the McGoughs stated they were going up to Mrs. Boshell's and

the younger McGough, after testifying he and defendant went to the deceased's home and then left, after which he saw defendant no more that day, admitted he went back up to the deceased's where he remained for a considerable time and did not reach his home, about three-quarters of a mile distant, until long after dark.

■ We regard the evidence sought by the cross-examination of the McGough witnesses to have been competent and material. Laying aside for the moment the question of whether or not the evidence sought to be elicited would have been admissible as tending to cast suspicion on the McGoughs or one of them as the perpetrator of the crime, it was clearly admissible by way of impeachment as bearing on their credibility. Spicer v. State, 198 Ala. 13, 73 So. 396; McDonald v. State, 165 Ala. 85, 51 So. 629; Smith v. State, 9 Ala. 990. Also, the inquiry directed to the younger McGough as to whether or not he and Mrs. Boshell had had trouble or had had a falling out was admissible as a circumstance to cast suspicion on him. This being a case of circumstantial evidence, testimony may permissibly take a wide range and any fact from which an inference may be drawn relating to the crime is competent evidence. Morris v. State, 25 Ala.App. 175, 142 So. 685; Lancaster v. State, 21 Ala.App. 140, 106 So. 609. In order to rebut the circumstantial evidence against him, the defendant had a right to introduce any legal evidence tending to show that some one else may have been guilty in exoneration of himself. Spicer v. State, supra; McDonald v. State, supra; Levison v. State, 54 Ala. 520; Alston v. State, 63 Ala. 178; Scott v. State, 96 Ala. 20, 11 So. 193. In the light of the holding in McDonald v. State, supra, as applied to the facts there related, the stated cross-examination of Wesley McGough was proper under the foregoing principle and its denial was error.

We pretermit consideration of whether or not the cross-examination of Richard McGough would have been competent under the last-stated principle. Alston v. State, supra. But see 22 C.J.S., Criminal Law, § 622, pages 949, 952; Levison v. State, supra; Walker v. State, 139 Ala. 56,

35 So. 1011; Tatum v. State, 131 Ala. 32, 31 So. 369.

Clarence Spain was another material witness for the State who testified against the defendant. Among other things, he identified the bloody stick found in the home of the deceased as being the identical one in the possession of the defendant the day before when defendant came by his house and his brother-in-law sold him a quart of whisky. He was a close neighbor of the deceased and joined the party of citizens, between fifty and one hundred in number, who were searching for the defendant. He had a gun, and the defense on cross-examination sought to show that he had made statements to certain persons to the effect that he was going to "shoot the defendant on sight" and "bring him in dead or alive." The court unduly limited the defendant in this proffered cross-examination, and also denied the defendant the right to put on a witness, for whom a proper predicate had been laid, to prove he had made such statements. We also view this as error. Such evidence if shown would have had a direct bearing on the witness' feeling toward the defendant and would have shed light on the credibility of his testimony.

"As affecting credibility, it is permissible, on cross-examination, to inquire of a witness concerning his relations to the parties, or to the subject-matter of controversy, or as to the feelings of sympathy, or partiality, or hostility which he may entertain, or may have expressed towards the party introducing him, or against whom he is introduced * * *." Yarbrough v. State, 71 Ala. 376.

(In that case error was pronounced in the refusal to permit defendant to cross-examine a State's witness as to whether a short time prior to the trial witness had not stated to a certain person "he would give $1,000 to send defendant to the penitentiary.")

The court is also of the opinion that the trial court limited defendant too strictly in the further cross-examination of the witness Spain by denying him the privilege of developing the entire transaction he testified to regarding the sale by his young brother-in-law, Massey, of the quart of whisky to the defendant at his home that morning. The established rule is that the accused is entitled to cross-examine a witness upon any matter testified to by him on direct examination as testing his memory, credibility, knowledge and accuracy. Covis v. State, 22 Ala.App. 579, 118 So. 49; Id., 218 Ala. 704, 118 So. 920; Scott v. State, 22 Ala.App. 383, 115 So. 855; Alabama Digest, Witnesses, ☞268 (3). Our view is, the defendant had a right on the cross-examination of witness Spain to inquire of him if it was not a fact the whisky, which he told defendant he did not have but could get from Massey, his brother-in-law, was his own and that Massey made the sale for him, as bearing on the witness' credibility. Cf. Middleton v. Western Union Tel. Co., 197 Ala. 243, 72 So. 548; Scott v. State, 22 Ala.App. 383, 115 So. 855.

We are mindful of the general principle that much is left to the judicial discretion with respect to the right of cross-examination, but that right cannot be too strictly limited and in the instant case we are of the opinion that the learned trial judge, by the rather persistent interposition of objections by the State, was lead to overlook the pertinency of the rules of evidence adverted to above, resulting in error prejudicial to the defendant.

In view of another trial another ruling on a matter of evidence will be mentioned. To show flight, the State offered evidence that the police officers and a posse of citizens proceeded immediately to search for the defendant and continued the search for several days, but that he could not be found and did not show up until he surrendered to the sheriff of Walker County some eight days later. To explain this conduct as consistent with innocence, the defendant offered to prove by his nephew, Wesley Dutton, that he, Dutton, on Sunday morning after the body was discovered the previous morning, visited the defendant at defendant's home and informed him that crowds of people were searching for him, that they were accusing him of the crime and were threatening to

shoot him and that he, Dutton, would try to get in touch with the officers to get them to call the men out of the woods so that defendant could surrender and that in fact the sheriff had then been contacted for that purpose. This evidence would have been competent and is rested on the principle that when flight has been proven, any fact or circumstance may be shown as shedding light on the defendant's motive in fleeing. What was communicated to him to induce his flight as well as his acts and words which are so connected with the flight as to give character and color to it are admissible as parts of the *res gestae* of the flight. Goforth v. State, 183 Ala. 66, 69, 63 So. 8.

Following is a good statement of the rule, well supported by competent authority:

"* * * After evidence of flight has been introduced * * * evidence offered by accused which has some tendency to explain his flight is relevant and must be received. Any fact is admissible in his behalf which shows that the reasons and motives of his flight were consistent with his innocence. His acts and declarations during his flight are admissible in explanation thereof, but not to show his innocence. He may show that he was insane when he absented himself; *that he fled on the advice of his counsel, relative, or friends*; that he intended and had arranged to leave the state before the crime; *or that he fled because of fright, or because of threats or fear of mob violence*." (Emphasis supplied.) 22 C.J.S., Criminal Law, § 625, pages 961, 962.

The emphasized portion is pertinent to the instant status. The court forbade defendant to fully develop by the testimony of witness Dutton the circumstances with reference to what Dutton told him and as to his "staying in the woods" until the sheriff would call off the posse so he could surrender, by way of explaining his alleged flight. The court did in one instance allow the witness to answer a portion of the inquiry, but then cast doubt upon his ruling by stating "I don't think it's legal, but I will overrule the objection. Let him answer it." This expressed doubt naturally would disparage such testimony and affect its weight when considered by the jury. Full proof of the circumstances adverted to to fully develop the proposition were denied defendant. On a consideration of the entire interrogation, in connection with the rulings of the court thus made, we have concluded that error also prevailed here to the prejudice of the defendant.

While some one of the errors might not be regarded as sufficiently prejudicial to warrant a reversal, the total of the errors noticed, in our opinion, does and it is so ordered.

The remaining propositions insisted on as error are either without merit or will probably not occur on another trial, so we forego further consideration.

Reversed and remanded.

LIVINGSTON, C. J., and BROWN and GOODWYN, JJ., concur.