Appellant was convicted of murder in the first degree and sentenced to life imprisonment in the penitentiary. He was represented by court-appointed counsel and at arraignment pleaded not guilty. After conviction he gave notice of appeal and was furnished a free transcript. Trial counsel was appointed to represent the appellant on this appeal.
Omitting the formal parts the indictment charged:
 "The Grand Jury of said County charge that, before the finding of this indictment, Arthur Webster Breen, whose name is to the Grand Jury otherwise unknown, unlawfully, and with malice aforethought, killed Mary Carolyn Epperson by choking her with his hands, or by means otherwise unknown to the Grand Jury . . ."
The evidence presented by the State is wholly circumstantial. In the light of appellant's motion to exclude on the ground the State failed to make out a prima facie case we will set forth a recital of the evidence.
The deceased, Mary Carolyn Epperson, was a cashier at the Western Hills Supermarket located near the Eastwood Mall in Birmingham. A few minutes before 5 o'clock on the morning of Saturday, September 20, 1975, Berlon Sullivan, the night manager of this supermarket, noticed Mrs. Epperson talking to a white male near the front door of the store. Mr. Sullivan was busy in the office at this time and his attention was diverted to the business at hand. A few moments later he looked in that direction and noticed that Mrs. Epperson and the man with whom she had been talking were gone. Before this occasion, every time Mrs. Epperson left her station, she told Mr. Sullivan where she was going. An immediate search of the store was conducted and Mrs. Epperson was missing. A check of the cash register used by Mrs. Epperson revealed that all the currency was gone. Mr. Sullivan stated that he was positive the man with Mrs. Epperson was white as he was wearing a short sleeved or sleeveless shirt. Mr. Sullivan did not see the man's face and could not identify him. He stated that on the morning Mrs. Epperson disappeared she was wearing a black skirt, white blouse and orange colored jacket.
Approximately one month later, October 18, 1975, a young man, Richard Todd Murphy, and a companion were hunting in the community of Rosehill off Brownlee Road in a densely wooded area. Murphy discovered a badly decomposed body. He immediately notified the authorities and officers from the Birmingham Police Department, Jefferson County Sheriff's Department, and Mr. Jack Parker from the Jefferson County Coroner's Office went to the scene where the body was found. Parker described the scene and the body. He stated the body was a badly decomposed female and she was dressed in a black skirt, black panties, bra, slip and a white long sleeved shirt. He further testified the legs were more or less spread eagle and the head was disconnected from the torso. The feet were missing from the ankles and the wrists of both hands were bound with several strips of cloth in the manner and fashion of handcuffs.
Several photographs were taken of the scene and the dead body. A proper predicate was laid and these photographs were introduced into evidence. The photographs of the body were objected to on the ground that they were gruesome and would tend to inflame and prejudice the jury. The objection was overruled and the photographs were received in evidence.
Dr. Henry Santani, a pathologist, conducted an autopsy on the body of the deceased *Page 115 
on October 19, 1975. He stated that he had performed between four and five thousand autopsies during his career. Dr. Santani gave a detailed account of his finding during the autopsy and noted particularly that the right and left wrists were tied behind the deceased's back with some grayish white cloth. He testified that because of the advanced state of decomposition of the body, it was difficult to pinpoint the cause of death, but because there was more rapid decomposition around the neck this was a condition consistent with hanging or strangulation. He said that strangulation, more often than not, will break some of the superficial bones in the neck. One of these bones was not found — it has a technical name of hyoid. He further stated that the head had been disarticulated from the body and the right shoulder had been disarticulated from the joint. He gave an opinion that the body had been in the woods from four to six weeks prior to the autopsy.
On cross-examination Dr. Santani said that any definite statement as to the cause of death would be conjecture.
Dr. Santani stated that the cloth strips that were found on the wrists of the deceased were given to Officer Crocker who was an Evidence Technician with the Birmingham Police Department.
Sergeant William Thomas Gaut, who was employed by the Police Department of the City of Birmingham — Homicide Division, testified that he along with several other officers went to the scene where the body was discovered. In the course of his investigation he found a Timex watch with a blue crystal face and a silver ring commonly known as a spoon ring. These items were turned over to Police Officer R.K. Crocker who at the time was an Evidence Technician with the Police Department. The watch and ring were subsequently submitted to Mr. Robert Epperson, the ex-husband of the deceased, who identified these items as belonging to Mary Carolyn Epperson.
Sergeant Gaut further testified that he and Officer Barefield went to the DeKalb County Jail to interview the appellant who was in custody on a robbery charge in DeKalb, Georgia. They had been informed by the Georgia officials that appellant had told two inmates at the same jail that he had committed the murder in question. The two inmates Stanley Dyen and Joseph Ray were interviewed by Officer Gaut, who took signed statements from both.
Sergeant Gaut interviewed appellant in the interrogation room at the DeKalb County Police Department. Appellant was told by Sergeant Gaut that he was an officer with the Birmingham Police Department and that he was investigating the death of Mary Carolyn Epperson. He advised appellant of his constitutional rights and appellant replied that he knew his rights. Officer Gaut testified that he did not threaten appellant, and did not make any promises to him, and held out no hope of reward or other inducements to get appellant to make a statement to him.
From the record:
 "I told Mr. Breen that I wished to question him in particular about a female who had disappeared in Birmingham and whose body had subsequently been found. And I asked him if he was in Birmingham at the time that the woman disappeared. He stated to me that he was. I believe I asked him, generally, if he had anything to do with that disappearance or knew or had any information about the disappearance. He stated to me that at that time that he did not. I explained to him that I was questioning him in reference to a possible charge of murder in the first degree and he interrupted and asked me, what about my wife, I believe was the words. I replied to him, well, what about your wife. And he said, are you going to charge my wife. And I said, well, at this point I can't answer that question, I don't know. The investigation is pursuing now and I don't know what, if any, charges will be brought against your wife. And he said, if you will guarantee immunity against prosecution for my wife in writing then I will tell you about it.
 "Q. About it. Was he referring to this conversation that you're having about the disappearance of the woman? *Page 116 
 "A. Yes. The conversation was in regard to the ultimate disappearance and finding the body of Mary Carolyn Epperson.
 "MR. SHIELDS: Your Honor, excuse me. We object again, not on the same grounds, but we think unless there's going to be some corroboration of what the Sergeant says that this testimony should be deemed inadmissible.
"THE COURT: Overrule.
 "THE WITNESS: As I said, he stated to me that in effect, I can't recall his exact words, but he said, if you will guarantee me immunity against prosecution of my wife in writing then I will tell you about it. And I replied to him that I could not guarantee immunity or prosecution not only for his wife or anybody else, that I didn't have the power to do that. He stated at that time that he did not want to make a statement then. He said he didn't want to make a further statement to me at all and the interview kind of ended at that point.
"Q. And you ceased to question him at that time?
"A. Yes, sir."
While the Birmingham officers were in DeKalb County, Georgia, in furtherance of the investigation of the death of Mrs. Epperson Sergeant John Barefield examined a jacket which was seized from appellant at the time he was arrested by the Georgia officials. From this jacket Sergeant Barefield removed two hair samples which were stuck to the sleeve. The hair was placed in a sealed envelope and turned over to Sergeant Gaut. These hair samples were later turned over to Robert Johnson, Supervisor of Scientific Investigation with the Birmingham Police Department.
Officer Richard Keith Crocker testified that on October 18, 1975, he was employed as an Evidence Technician with the Birmingham Police Department and he went to the scene where the body of Mrs. Epperson was found with Mr. Robert Johnson; that he and Robert Johnson worked as a team during this investigation. He further testified that he collected separated portions of hair 18 inches from the left shoulder of the body and collected hair from under the skull. He stated that he noticed several ligature type bindings around the wrists, about three sets. He said the hair and the ligature bindings were carried by him to the crime laboratory and delivered to Robert Johnson.
Mr. George Averitt testified that he was manager of the Siesta Motel in Birmingham in the summer of 1975. He stated that a man registered at the motel in July, 1975, under the name James Kelley. He was asked if the man who registered in the Siesta Motel in July of 1975 as James Kelley was in the courtroom and he replied, "Yes, sir." He was then asked to point him out to the jury and he said, "yellow shirt" (indicating). The District Attorney then said, "Let the record indicate that the witness has pointed to the defendant Arthur Webster Breen."
Mr. Averitt further testified that appellant and his wife stayed at the motel from July until September 21, 1975. He stated that he saw him twice on September 21, 1975. The first time he saw him he paid for two days, the 21st and the 22nd. He said that about two hours later appellant came back and got a refund for the two days, saying, "He had to check out. He just said he had to leave."
Mr. Averitt was then asked what type of employment appellant (Kelley) was engaged in during the time he was a guest at the motel and he stated that appellant told him he was on vacation. He further testified that appellant was driving a blue Camaro, either a '74 or '75 model but he was not sure about the model. Mr. Averitt stated that appellant and his wife stayed in an apartment at the motel that costs $106.00 per week or $350.00 a month.
Mr. Averitt further said that the sheets used by the motel had hems stitched in green thread. While on the witness stand he was shown the wrist binding found on the victim and he stated it appeared similar to the hem of the sheets used at the Siesta Motel. The bindings from the wrists of the deceased were marked State's Exhibit No. *Page 117 
7, and a sheet borrowed from the motel was marked State's Exhibit No. 9. More will be said about these exhibits later in this opinion.
Officer Jerry D. Macumber testified that he lived in DeKalb County, Georgia, and was employed as an Investigator by the Police Department of that county, and was assigned to the Homicide Division. He said that he arrested Arthur Webster Breen on October 6, 1975, at 1930 Flatshores Road, Apartment M-1, and that at the time of the arrest he seized a jacket belonging to Arthur Breen. He brought the jacket with him to the trial of appellant and it was marked for identification as State's Exhibit No. 8. This officer further testified that this jacket had been in his custody and under his control since he arrested Arthur Webster Breen. He stated the jacket had been maintained in a box which was sealed with his signature and it was kept in a vault. He stated that he permitted the Birmingham officers to inspect the jacket when they came to DeKalb County.
Mr. Robert B. Johnson testified he was presently employed as the Supervisor of Scientific Investigation with the Birmingham Police Department and had been so employed since August 20, 1975. He said that prior to that date he was an Assistant State Toxicologist for 20 years. He stated his education and background experience in the area of hair identification.
In addition to receiving hair samples removed from appellant's jacket by Officer John Barefield and the hair samples from the skull of the deceased, plus some separated hair near the body, Johnson also received the cloth strips used as wrist binders on the victim, together with a sheet taken from the Siesta Motel near the Eastwood Mall. Johnson made a microscopic examination and comparison of the hair from the victim with the two hairs taken from the sleeve of appellant's jacket. From his examination and comparison Johnson concluded that the hairs were similar. He further testified that there was a great deal of variation in hair diameter, color, length and texture on a single head and for this reason hair could not be specifically identified as belonging to a particular individual. He concluded by saying that hair identification could not be placed in the same category as fingerprints, but the hair samples examined by him were of a similar nature.
This witness was shown State's Exhibits No. 7 and No. 9 referred to and stated:
 "Q. All right, sir. Now, with these bindings that are marked as State's Exhibit 7 and this sheet marked State's Exhibit 9, did you make a comparison or did you make a study of this sheet and these bindings together?
"A. Yes, sir, I did.
 "Q. Would you tell the ladies and gentlemen of the jury what you did, how you examined them and what your conclusions or your opinion was, please, sir?
 "A. At the time we first recovered the bindings, they appeared to be strips of cloth that were badly stained. We took them back to the lab and cleaned them up, at which time Mr. Crocker recognized the fact that there was a small blue-green thread made into the fabric itself. He pointed it out. At a later date when Sgt. Barefield turned this sheet that you just handed me over to me we compared the fabric and found the same green thread in it that was in the bindings in the same location, and showed that the bindings were, in fact, the hem from a sheet.
 "Q. All right, sir. These bindings within this sack are what you call hems from a sheet?
"A. Yes, sir.
 "Q. Was it your opinion that State's Exhibit 7 and State's Exhibit 9 are similar or are the same or were made of the same material, or can you say?
 "A. They are similar. It was in my opinion that at one time it was part of a sheet similar to the sheet that you have in evidence.
 "MR. RUSSELL: All right, sir. We offer both of those at this time, Your Honor.
"MR. SHIELDS: Objection, Your Honor.
"THE COURT: Okay. Let him mark them. *Page 118 
 (Whereupon, said exhibits, having been previously marked for identification as State's Exhibits 7 and 9, were then received in evidence. These exhibits have been delivered to the office of the Clerk of the Court in accordance with the Rules of Appellate Procedure, adopted June 17, 1975.)
 "Q. Bob, I'll show you these bindings marked State's Exhibit 7 again, please, sir, and ask you if these bindings are what we refer to as a handcuff style binding?
 "A. Yes, sir. When we removed them from the body two of the ends were over both wrists, tying them together. At one time one or more of them appeared to have been tied also to the ankles. As I recall, the wrists had two bindings on each wrist and one or more were also connected to the ankles.
 "Q. And they were separated. Is this where one wrist would be located and this where one wrist would be located?
"A. That is correct."
Ms. Patricia Ann Matthews testified that on September 20, 1975, between 3:00 and 3:30 a.m., she was driving her automobile on Third Avenue West and that she stopped her automobile as she had lost her direction. She further testified that a car stopped in front of her and a man got out and came back to her car and said, "He told me, he said, `Lady, you are driving with your lights on bright.' He said, `You are blinding me.' I looked down and my lights were on bright. I told him, I said, `I am sorry, I am lost,' and I told him my destination and he told me to pull over to the side of the road and he would tell me how to get there." She was asked if the man who came to her car on that occasion was in the courtroom and she said, "Yes, sir." She was asked to point him out and she replied, "That one in the yellow shirt," (indicating). The District Attorney said, "Let the record indicate that she is pointing to the defendant Arthur Webster Breen."
She further testified that she did pull over to the side of the road and he pulled over first. He got out of his car and he came back to her car, that he pointed a gun in the window and told her that this was a holdup, and to open the door. She told him that he had to be kidding her and he said, "No, lady, I am not kidding," and she said that he told her, "Don't give me any trouble." He opened the door to her car and got in. After getting in her car and parking it on a side street by the side of a service station, he forced her at gunpoint to walk across and get in his car. She said that the automobile he was driving was a Camaro.
She further testified that this man told her to hand him her wrists and she handed her right wrist to him first and the man tied her wrist with ropes already stationary in the car and he then reached and got her other wrist and tied it behind her back.
She stated that he was driving west on Third Avenue and while driving he demanded money from her. She stated that he got her purse and belongings. At this time she told him that she did not have any money and he replied, "You're going to meet some friends and they will have fifty or sixty dollars." She told him that they didn't have that kind of money and he replied, "Your body is worth that much." As they were driving along Third Avenue West near the Holiday Inn, she jumped out of the automobile and ran back of the Holiday Inn and the man shot at her.
She stated that she called the police officers and they came to the place where she called them and she talked to Detective Gaut and Detective Simms. She further testified that the officers took her back to her automobile and it had to be hot-wired as the man took the keys from the ignition when he made her get out of her car.
On cross-examination she testified that the ropes were already in the car and that he tied her wrist with one of the ropes that was stationary in the car and then reached over and tied her other hand behind her back. She made a positive in-court identification of appellant as the man who kidnapped her and robbed her. She described him as having long hair parted in the middle. She said she could not be mistaken as *Page 119 
to the identity of the appellant as she got a full view of his face twice when he came to the window of her car.
She further testified, "I was scared to death, especially when he threatened to kill you right there. He had gone about two blocks from where he abducted me and he saw a man in a phone booth and he was going to turn around and kill him. I made the statement, I told him, `You've got no reason to kill him.' He said, `He might have seen what was going on.' I said, `Sir, he was too far away to see what was going on.' That's when he stuck the gun in my side and told me not to call him sir, call him James."
Ms. Samantha Lee testified that she was employed at Majestic Studios located at 1034 Third Avenue West and that this place was a massage parlor. She stated that on Friday morning, September 19, 1975, about 3 o'clock, she was working at the massage parlor and that there were four other women working there also. She said a man came in and paused at the door and she asked him if she could help him, and that he stood there for a little while and then reached behind him and took out a gun and pointed it toward the guard there in a chair, that he told the guard to give him his pistol, or otherwise he would shoot him; that this was a holdup. She was asked if that man was in the courtroom and she said, "Yes, sir," and she pointed to the one in the yellow shirt. The record discloses that she pointed to the defendant, Arthur Webster Breen.
She further testified that he made the guard lie down on the floor and ordered her to give him the money out of the cash drawer and she gave him the money. She stated that after she gave him the money, he tied her and one of the other girls; that in tying up the guard and her and the other girl, he used part of a towel. She said that several customers came in and also two other girls that were working there. He tied those girls up with strips of sheets and he tied up all the customers with strips of sheets; that he carried all of the people in one room together and took stacks of sheets and tore the ends off the sheets using the hems and tied the wrists of everybody behind their backs. She stated that she worked her hands loose from the towel that he had bound her wrists with and he came back and used strips of the sheets and wrapped them around her wrists several times behind her back.
She was shown State's Exhibit No. 7, which showed the strips binding the wrists of the deceased and she testified that he bound and tied her and everyone else in the massage parlor in the same fashion as shown in State's Exhibit No. 7.
After he had bound and tied everyone's wrists and hands be hind them, he took the money which he had forced her to give him from the cash register and left and in leaving he attempted to take one of the female employees with him but she evaded him and he made his escape.
At the conclusion of each of these witnesses' testimony appellant's counsel moved to exclude the testimony on the grounds that there had been no showing that there was any connection with the case at bar. The Court overruled the objection.
Officer William Thomas Gaut was recalled to the stand for further testimony and he testified that he and Sergeant Barefield checked all of the sheets in all motels within a radius of five miles of the Eastwood Mall and that at only one motel did they find the hem of a sheet showing green thread in the hemline that matched the strips that were found on the wrists of the deceased as shown in State's Exhibit No. 7. He stated that this sheet was found at the Siesta Motel.
During the time that appellant was in the DeKalb County Jail in Georgia he became friendly with two convicted felons who were in the same cellblock. He had several conversations with the convicts over a period of time in which he admitted kidnapping a woman during a robbery in Birmingham and that he carried her to a motel and held her hostage for a period of time. He said that he was expecting a murder warrant from Alabama and that it would be for murder one. *Page 120 
These two convicts gave written statements to Officer Gaut and they were brought to Alabama to testify for the State in appellant's trial. A copy of each convict's statement was given to him while he was on the witness stand and a copy of each statement was given to defense counsel. The trial judge stated that he was going to permit the District Attorney to lead these witnesses to be sure that appellant's previous criminal record was not brought out before the jury. No objection was made by defense counsel to this procedure.
Stanley Martin Dyen testified, in substance, that he was lodged in the DeKalb County Jail in November 23, 1975. He stated he had previously been convicted on a robbery charge and that he had criminal charges pending against him for car theft, credit cards, burglary and theft. That he became acquainted with Arthur Webster Breen while they were in jail, and that Breen told him he was worried about a warrant for murder one
coming for him from Alabama, but that he had talked with the detectives from Alabama and all they had was a piece of hair and a piece of cloth and they could not prove anything. Breen said he took the car over to a car wash and got it cleaned and further said that they had two numbers on his license plate from Alabama but he changed plates and put on a New York license plate.
Dyen stated that Breen said he had committed the murder but the people couldn't prove it and asked him what he thought he ought to do or say. Dyen said he told him it was up to him.
During a third conversation Dyen stated that Breen said the woman was apprehended during a robbery and they forced her to come back over to a motel and later they carried her out to a forest, and tied her up. After tying her up they "ought" her. He was asked in slang language what "ought" meant to him and he replied, "He killed her." He stated that Breen told him that he had tied her up with a cord and hanged her or put a rope around her neck or something like that; that Breen stated that he hanged her but the witness said he didn't know if Breen meant he hanged her from a limb or tree.
In another conversation Dyen said that Breen stated that he put her body in a wooded area and thought no one would be able to find her for a long time.
Dyen concluded his statement by saying that he made the written statement about Breen's conversation with him of his own free will; that he had not been threatened in any manner nor had he been promised anything, and that he had not been offered any reward to get him to testify or sign the written statement.
Joseph Ralph Ray was the other cellblock mate that Breen had several conversations with concerning the death of a woman in Birmingham. He, too, gave a signed statement to Officer Gaut and the same procedure was followed in the giving of his testimony that was carried out during Dyen's testimony. He stated that he was serving time on a child molestation conviction and was awaiting trial on an escape charge.
He testified that beginning in November of 1975 he had several conversations with Arthur Webster Breen. Breen told him he was expecting a murder warrant from Alabama coming in the near future. Ray asked him what took place and Breen told him that a girl was found murdered and tied up. Ray testified that Breen told him that he had a pattern in his methods. That he asked people whether they were right-handed or left-handed and that way he would know how to tie them up. Ray asked Breen if this girl in Alabama was tied up and he said yes. Breen further told Ray that he did it but they will never be able to prove it.
Ray further stated that Breen told him that a child would take the witness stand and say that Uncle Artie took us to the movie and that he was watching television at home when it happened. Breen further said who would question the sincerity of a small child.
Ray stated that in another conversation when Breen was talking about the kidnapping and murder he mentioned the name of *Page 121 
a motel somewhere out of Birmingham where he was staying but they wouldn't be able to trace him to the motel because he had registered in a fictitious name. He said that Breen stated when he registered he put "Chevrolet" in the blank for the make and model of the vehicle and in the blank for the license plate he had inserted the word "rented." That he just put "rented" for the Chevrolet rather than put the blue Camaro on the registration.
Ray further testified that Breen told him the woman had been abducted and that he had held her hostage for a while. Breen also told Ray that he had cleaned the car out to erase any traces that might be in the car.
Ray concluded his testimony by saying that his testimony was the truth, to the best of his memory, as to all the conversations he had with Breen over a period of time. That he had not been threatened in any way to sign the statement he gave Officer Gaut and he had not been promised anything in exchange for his testimony.
Appellant did not testify, nor did he offer any evidence in his behalf.
Where the State relies upon circumstantial evidence for a conviction, "testimony may permissibly take a wide range and any fact from which an inference may be drawn relating to the crime is competent evidence." Green v. State, 258 Ala. 471,64 So.2d 84, 88; Dockery v. State, 269 Ala. 564, 114 So.2d 394. It has also been held that any testimony tending reasonably to establish the probability or improbability of the fact in controversy is admissible in evidence. Hunter v. State,38 Ala. App. 351, 83 So.2d 737; Holland v. State, 25 Ala. App. 147,142 So. 112.
In DeSilvey v. State, 245 Ala. 163, 16 So.2d 183, the Supreme Court held:
 "Of course, in every criminal prosecution the burden is on the State to prove beyond a reasonable doubt the crime charged has in fact been committed and that the accused is the person who committed it. It is well settled that circumstantial evidence may afford satisfactory proof of the corpus delicti. Winslow v. State, 76 Ala. 42.
 "True, the Court must first be convinced, at least prima facie, that an offense has been committed before it will consider who perpetrated the crime. As pointed out, however, in Ducett v. State, 186 Ala. 34, 65 So. 351, this does not mean that the fact that a crime has been committed should be shown by evidence wholly independent of the relation of the accused to the offense charged. The evidence that defendant committed the crime may be so inextricably blended with proof of the corpus delicti as to make a separation impossible. As to whether or not a prima facie case of the corpus delicti has been made to appear depends, of course, upon the facts of each particular case."
In Harnage v. State, 49 Ala. App. 563, 274 So.2d 333, this Court stated:
 "Circumstantial evidence may afford satisfactory proof of the corpus delicti in a murder prosecution, and, if facts are presented from which the jury may reasonably infer the crime has been committed, the question must be submitted to the jury, and other evidence tending to implicate the defendant is thereby rendered admissible. Johnson v. State, 247 Ala. 271, 24 So.2d 17; Phillips v. State, 248 Ala. 510, 28 So.2d 542; McKee v. State, 33 Ala. App. 171, 31 So.2d 656."
The general rule is that evidence of distinct and independent offenses, sometimes referred to as collateral crimes, is not admissible in the trial of a person accused of a particular crime. However, there are well-recognized exceptions to this general rule and one of paramount importance is the "identity exception."
These recognized exceptions to the general rule have developed into general categories and are listed in Wharton's Criminal Evidence, Section 31, as follows:
 "These exceptions fall under the following general divisions: (1) Relevancy as part of res gestae, (2) Relevancy to prove identity of person or of crime, (3) Relevancy to prove scienter or guilty knowledge, (4) Relevancy to prove intent, (5) *Page 122 
Relevancy to show motive, (6) Relevancy to prove system, (7) Relevancy to prove malice, (8) Relevancy to rebut special defenses, (9) Relevancy in various particular crimes. It is recognized that in many instances the line of demarcation is not clear, but the discretion vested in the trial judge, intelligently and considerately exercised, will enable the prosecution fully to present the charge, on the one hand, and, on the other hand, to protect the accused and secure to him the rights guaranteed to him by the Constitution and the laws."
From Wilkins v. State, 29 Ala. App. 349, 197 So. 75, we take the following as expositive of one of the issues presented on this appeal:
 "* * * It is a well-established common-law rule that in a criminal prosecution proof which shows or tends to show that the accused is guilty of the commission of other crimes or offenses at other times, even though of the same nature as the one charged in the indictment, is incompetent and inadmissible for the purpose of showing the commission of the particular crime charged unless the other offenses are connected with the offense for which he is on trial. In other words, proof of such collateral offenses cannot be used as substantive evidence to establish the guilt of the accused as to the crime charged. 20 Am.Jur., Section 309, pp. 287, 288. Wharton's Criminal Evidence, 10th Ed., Volume 1, Section 30, p. 59. This well-established principle of criminal evidence, however, is subject to several, equally well-established exceptions, which include cases where intent or identity is involved. As found in 22 R.C.L., Section 39, p. 1204: `But this general rule is not to be followed blindly and evidence rejected on the sole ground that it does show the commission of another crime. If evidence is relevant and competent it should be admitted regardless of its incidental effect. Accordingly it is held that evidence of another crime is admissible where it tends to identify the accused.'
 "And we also add that such evidence should also be admitted where it tends to show the intent with which the act was done. Or as stated in Underhill's Criminal Evidence, 4th Ed., Section 181, p. 318: `To this general rule there are several distinct exceptions which have been permitted from absolute necessity, to aid in the detection and punishment of crime. These exceptions ought to be carefully limited and guarded by the courts and their number should not be increased. But it must be admitted that the modern
tendency on the part of the courts is to be liberal
in the admission of evidence of collateral crimes. The exceptions to the general rule arise either from the necessity of the case or the nature of the offense, as for example, * * * when the intent or motive is to be proved from the circumstances, or where the identity of the accused is expressly in issue.'" (emphasis added)
In Judge J. Russell McElroy's "Law of Evidence in Alabama", vol. 1, 2d Ed. Section 69.01 (8), we find the rule stated to be:
 "All evidence tending to prove a person's guilt of the now charged offense may be loosely said to identify him as the guilty person. But identity, as here used, assumes what may be called a `mark' upon the guilty person, and then proposes to show that the accused is the person having that mark as evidenced by its being upon him in his commission of another similar offense. Wigmore, Sections 410-412; Mason v. State, 259 Ala. 438, 66 So.2d 557.
 "Thus, when it is shown that the person who committed the now charged offense in a novel and peculiar manner, it may be shown that the accused committed other similar offenses in the same novel and peculiar manner. . . . This is sometimes called evidence of a `pattern' of `modus operandi.'"
These exceptions to the general rule have become so embedded in the judicial fabric of the jurisprudence of this State that further citation of authorities would seem to be unnecessary. But for a collection of *Page 123 
these authorities, see Weatherspoon v. State, 36 Ala. App. 392,56 So.2d 793.
With reference to the other offenses allegedly committed by appellant the trial judge was exceedingly careful in his oral charge to the jury in limiting the other offenses to the issue of the identity of the accused as the person who committed the offense charged in the indictment. The oral change, in pertinent part, is as follows:
 "Now, there was evidence adduced in this case that the defendant prior to the occasion in this case or some time prior to the disappearance of Mrs. Epperson, that the defendant had perpetrated other acts which in and of themselves were crimes. Now, ladies and gentlemen, that was introduced for this reason: First of all, that is for your consideration. You can either believe that testimony or not believe it. That is for the jury to determine. But if believed by you you should not say, well, the defendant committed those crimes, therefore he must have committed this crime just based just on that. That testimony was introduced to you for your consideration as to the identity of the defendant, and as it pertains to this case as to the identity of the person who committed this crime alleged in this indictment. That is, that was introduced in this case for your consideration as to whether you believe the defendant was the man who actually committed the crime embraced in this indictment. Just because you think that a person has a propensity to commit certain crimes does not give inference to the fact that he committed another crime. But if you believe in this case that the defendant committed these other crimes and that by committing those crimes it identifies him as the person who committed the crime charged in this indictment then you may take that into consideration in determining the identity of the person who allegedly committed the crime embraced in this indictment."
We here observe that at the close of the oral charge appellant's counsel stated, "No exceptions, Your Honor."
The evidence in this case shows that appellant abducted two women and attempted to abduct a third. In each instance he used substantially similar methods in binding the hands of his victims. All three incidents occurred in a time span of less than 30 hours before Mrs. Epperson was robbed and kidnapped. A combination of these similarities constitute a "novel and peculiar manner" of modus operandi which justified the trial court in admitting the testimonies of both Patricia Ann Matthews and Samantha Lee.
Appellant contends that it was reversible error for the trial court to allow Robert Johnson to express his opinion as an expert that hairs taken from the jacket of appellant were similar to the hair of the deceased. We do not agree.
Whether a witness has acquired knowledge beyond that of an ordinary witness so as to qualify him as an expert on a particular subject is within the discretion of the trial court and his ruling thereon will not be disturbed on appeal unless a clear abuse of such discretion is shown. Creel v. State,42 Ala. App. 225, 159 So.2d 809; Alexander v. State, 37 Ala. App. 533, 71 So.2d 520.
We hold there was no abuse of discretion in allowing Mr. Johnson to testify. The weight to be accorded his testimony was for the jury.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur. *Page 124